**STATE of Missouri, Respondent,**

v.

**John MIDDLETON, Appellant.**

No. 80043.

Supreme Court of Missouri,
En Banc.

June 29, 1999.

Rehearing Denied Aug. 3, 1999.

Elizabeth Unger Carlyle, Lee's Summit, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. General, John M. Morris, Assistant Attorney General, Jefferson City, for Respondent.

WILLIAM RAY PRICE, Jr., Judge.

A jury convicted John Middleton of first-degree murder for killing Alfred Pinegar. The jury recommended, and the trial court imposed, a death sentence. Middleton now appeals his conviction and sentence. This Court has exclusive jurisdiction over the appeal because Middleton was sentenced to death. *Mo. Const. art. V, section 3.* We affirm the judgment.

## I. RELEVANT FACTS

John Middleton was a user and dealer of methamphetamine. On June 10, 1995, police arrested several people in Harrison County, Missouri, for possession and sale of the drug. Middleton was not one of the people arrested. About ten days after the Harrison County arrests, Middleton told a friend that "the snitches around here are going to start going down." Middleton stated that he had a "hit list" and that Alfred Pinegar was on it. Two days after making these statements, Middleton told the same friend that he was "on his way to Ridgeway, Missouri, to take Alfred Pinegar fishing."

Alfred Pinegar was also a dealer of methamphetamine and was associated with Middleton as a fellow drug dealer. Pinegar lived with his fiancé Priscilla Hobbs in Davis City, Iowa, just north of Harrison County, Missouri. On June 23, 1995, the day of Pinegar's murder, Hobbs was driving toward her home in Davis City when she saw Middleton and his girlfriend Maggie Hodges in a white Chevrolet 4x4 pickup traveling in the opposite direction. Hobbs noticed that Hodges was sitting in the middle of the truck seat instead of in the right passenger's seat. When Hobbs reached her home, Pinegar was not there and the yard had been partly mowed, as if Pinegar stopped in the middle of the job. Pinegar habitually carried a twelve-gauge shotgun, and that shotgun and about two hundred dollars were missing from the home.

Around noon that same day, Wesley Booth was working in the sporting goods department of a Wal–Mart store in Bethany, Missouri. He was approached by Hodges, Middleton, and another man, presumably Pinegar. Middleton asked Booth for six boxes of nine-millimeter shells and two boxes of twelve-gauge "double-ought" buckshot. Middleton paid cash for the ammunition. During the entire transaction Middleton was standing at the counter across from Booth.

Middleton, Hodges, and Pinegar left Wal–Mart and drove several miles northeast of Bethany near the town of Ridgeway where they parked in a field. Pinegar got out of the truck and began to run when he saw Middleton raise the twelve-gauge shotgun. Middleton shot Pinegar twice in the back. Middleton then delivered the fatal wound to Pinegar, shooting him in the face. Middleton dumped Pinegar's body over a fence. After committing the murder, Middleton and Hodges went back to the Wal–Mart store in Bethany to return the nine-millimeter ammunition. They did not return the twelve-gauge "double-ought" shotgun shells. Booth walked with Middleton to the sporting goods department, where he exchanged the nine-millimeter shells for ammunition of another caliber. The two men then walked back to the service desk to complete the exchange.

Later that afternoon, Gerald Parkhurst saw Middleton and Hodges standing next to their pickup on the side of a road north of Bethany. Claiming their pickup had broken down, Hodges asked Parkhurst if he would give them a ride. When Parkhurst agreed to give them a ride, Hodges and Middleton transferred five or six firearms to the trunk of Parkhurst's car, including the twelve-gauge shotgun Middleton had used to kill Pinegar. Parkhurst took Hodges and Middleton to Spickard, Missouri, where they unloaded the weapons.

Two days after the murder, John Thomas visited Middleton at his home. Middle-

ton and Thomas discussed possible undercover drug informants, and Middleton stated that "something had to be done about them." Middleton also told Thomas that he had acquired Pinegar's twelve-gauge shotgun and that Pinegar "wouldn't be needing it no more." Thomas drove Middleton to the place were the pickup truck had broken down, helped him remove a defective part, and then Middleton drove the truck away. The next day, on June 26, Pinegar's body was found. At the murder scene, police found a piece of leather fringe, an empty box of twelve-gauge shotgun shells, two expended twelve-gauge shells, a pair of sunglasses with a missing lens, and a small plastic clock with an adhesive square on the back of it.

Later, on September 11, while Middleton was in jail, Middleton told Stallsworth, a fellow inmate, that he killed Pinegar because he was afraid that Pinegar was going to "snitch" on him about his methamphetamine dealing. Middleton described the details of Pinegar's murder. He also told Stallsworth that some fringe was missing from his leather jacket and he was worried that it had been left at the murder scene.

Middleton was charged by information with first-degree murder and armed criminal action on October 18, 1995, in the Circuit Court of Harrison County. The prosecutor later voluntarily withdrew the charge of armed criminal action. Following a change of venue to the Circuit Court of Adair County, the case went to trial on February 24, 1997. Middleton did not testify at his trial and offered no evidence in his defense. The jury found him guilty of first-degree murder. In the punishment phase of the trial the state presented, among other things, evidence that Middleton had also murdered two others, Randy Hamilton and Stacey Hodge, as part of his plan to eliminate "snitches." The jury recommended a death sentence.

## II. STANDARDS OF REVIEW

■ We review the evidence presented at trial in the light most favorable to the verdict. *State v. Storey,* 901 S.W.2d 886, 891 (Mo. banc 1995). The trial court is vested with broad discretion to admit and exclude evidence at trial. Error will be found only if this discretion was clearly abused. *State v. Simmons,* 955 S.W.2d 729, 737 (Mo. banc 1997), *cert. denied,* — U.S. —, 118 S.Ct. 1081, 140 L.Ed.2d 138 (1998).

■ On direct appeal we review the trial court "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Morrow,* 968 S.W.2d 100, 106 (Mo. banc 1998), *cert. denied,* — U.S. —, 119 S.Ct. 222, 142 L.Ed.2d 182; *State v. Hutchison,* 957 S.W.2d 757, 761 (Mo. banc 1997); *State v. Skillicorn,* 944 S.W.2d 877, 884 (Mo. banc 1997), *cert. denied,* — U.S. —, 118 S.Ct. 568, 139 L.Ed.2d 407 (1997). Issues that were not preserved may be reviewed for plain error only, requiring the court to find that manifest injustice or miscarriage of justice has resulted from the trial court error. *Simmons,* 955 S.W.2d at 737.

## III. ISSUES ON APPEAL

On appeal, Middleton alleges twenty-six issues of error. We address his claims as follows: Middleton claims the trial court erred by 1) admitting the identification testimony of Wesley Booth; 2) refusing to disclose the mental health records of state's witness Douglas Stallsworth; 3) allowing certain statements by the prosecutor during guilt-phase closing arguments; 4) admitting evidence seized during a search of Middleton's home pursuant to a search warrant; 5) admitting evidence seized in search of Middleton's vehicle without a search warrant; 6) allowing certain questions during cross-examination of defense witness Dr. Murphy; 7) denying a motion for a directed verdict of life in prison when a juror was excused after the guilt phase; 8) refusing to use Middleton's proposed penalty phase instruction adding one statutory mitigating circumstance; 9)

striking two venirepersons for cause; 10) limiting questioning of prospective jurors; 11) (Middleton's points 11 & 12) admitting a crime scene video, a photograph of the victim's body, and fragments of the victim's jaw bone and teeth during the guilt phase; 12) (Middleton's point 13) admitting expert opinion testimony; 13) (Middleton's point 14) refusing to grant a second change of venue; 14) (Middleton's point 15) admitting penalty-phase evidence of a crime scene video of two other murders committed by Middleton; 15) (Middleton's points 16 & 17) admitting testimony of Pinegar's mother and a photograph of Pinegar and his daughter at the penalty phase; 16) (Middleton's point 18) refusing Middleton's proposed penalty phase instructions on mitigating circumstances; 17) (Middleton's point 21) refusing to grant a second continuance; 18) (Middleton's point 23) refusing to grant a motion to dismiss on the grounds that the definition of first-degree murder is unconstitutionally vague; 19) (Middleton's point 24) refusing to quash the venire panel because it did not include persons between the ages of 18 and 21; 20) (Middleton's point 25) refusing to grant Middleton's motion to dismiss on the grounds of improper prosecutorial discretion; and 21) (Middleton's point 26) admitting an improper reasonable doubt instruction.

Middleton further argues that: 1) (Middleton's point 22) he is entitled to a reversal of his conviction and sentence because the transcript of his trial contains defects and therefore hampers his ability to bring an effective appeal; 2) (Middleton's point 20) his death sentence must be set aside because Missouri's proportionality review under section 565.035.3(3) provides no meaningful review in violation of his due process rights; and 3) (Middleton's point 19) his death sentence must be set aside because it is disproportionate to the punishment imposed in similar cases.

We first address the issues of alleged trial court error and then address Middleton's three additional challenges to his conviction and sentence.

## A. ISSUES OF ALLEGED TRIAL COURT ERROR

### 1. Identification Testimony of Wesley Booth (Middleton's Point 1)

■ Middleton claims the trial court erred by overruling his motion to suppress the identification testimony of Wesley Booth. Middleton asserts that Booth's identification was the result of an improperly suggestive procedure. Identification testimony is admissible unless the pretrial identification procedure was unnecessarily suggestive *and* the suggestive procedure made the identification unreliable. *State v. Vinson*, 800 S.W.2d 444, 446 (Mo. banc 1990); *State v. Hornbuckle*, 769 S.W.2d 89, 93 (Mo. banc 1989), *cert. denied*, 493 U.S. 860, 110 S.Ct. 171, 107 L.Ed.2d 128 (1989). "The linchpin of due process in identification procedures is reliability, not suggestiveness." *State v. Weaver*, 912 S.W.2d 499, 520 (Mo. banc 1995), *cert. denied*, 519 U.S. 856, 117 S.Ct. 153, 136 L.Ed.2d 98 (1996) (citing *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)).

■ In determining the reliability of a witness's identification, we consider 1) the opportunity of the witness to view the subject; 2) the witness's degree of attention; 3) the accuracy of any prior description given by the witness; 4) the level of certainty demonstrated by the witness in making the identification; and 5) the interval between the event and the identification procedure. *State v. Littleton*, 649 S.W.2d 225, 227 (Mo. banc 1983). Identification testimony is usually admissible because "courts rely upon the good sense and judgment of jurors for determining the trustworthiness of the identification." *Weaver*, 912 S.W.2d at 521.

### a. The Identification Procedure

■ Three days after the murder, police interviewed Booth about his encounters with Middleton at the Wal–Mart store in Bethany. Booth described Middleton as being slender and of medium height, with "sandy colored bushy straight hair." He

was shown fifteen to twenty photographs of men, including a photo of Middleton sitting in a chair. Booth picked out Middleton's photograph as resembling the man he had sold ammunition to, but he did not believe it was the right man because the hair of the man in the photograph looked shorter and he seemed slightly heavier.

About three months after the murder, Booth was subpoenaed to appear at Middleton's preliminary hearing. While at the courthouse, a prosecutor asked Booth to step into the hall to see if he could identify the man who had purchased ammunition from him on the day of the murder. According to Booth's testimony, approximately ten to fifteen people were in the hallway. Middleton was not then in the hallway; he arrived a few minutes later. When Middleton came into view, Booth immediately recognized him as the man who had bought the ammunition. Booth's testimony regarding his identification clearly demonstrates that he identified Middleton based on the recall of his first-hand observations of Middleton, not because of the influence of the identification procedure:

Q: Did [the prosecutors] have to tell you who to look at?

A: No.

Q: Why didn't they have to tell you who to look at?

A: I recognized him.

\* \* \*

Q: How was [Middleton] dressed?

A: Had a short-sleeve shirt. I don't really remember exactly how he was dressed; I was looking at his face.

\* \* \*

Q: [O]nce the prosecutors asked you ... to look in the hallway to see if you saw the person ... [d]id they give you any description about the person you were to look for in the hallway?

A: No.

Q: Did they tell you to look at the guy with handcuffs on?

A: No.

Q: When you saw this person, ... what was your first impression that made you recognize him?

A: Again, the eyes, the hair, even though it was shorter, was the same color, it was the same kind of dry hair.

Q: Do you recall if you made these observations before you saw the handcuffs?

A: I don't know.

b. **Reliability of the Identification**

Assuming arguendo that the identification procedure was impermissibly suggestive, a conclusion we do not reach, we find the procedure itself did not render Booth's identification unreliable. Booth had ample opportunity to view Middleton when he waited on him at Wal–Mart. He stood directly opposite Middleton at the store counter while Middleton purchased the ammunition. Booth also saw Middleton a few hours later when he came back to Wal–Mart to return some unused ammunition. Booth's degree of attention was quite high because, as he testified, Middleton purchased an unusually high quantity of ammunition and the shotgun ammunition was rarely requested at that time of year.

Further, Booth described the man he later identified as Middleton as slender and of medium height, with "sandy colored bushy straight hair." A comparison of this description to the photograph of Middleton admitted at trial reveals that Booth's description of Middleton's size, build, and hair color and style was accurate.

Booth was certain about Middleton's identity, identifying him immediately upon seeing him in the courthouse hallway. His testimony established that the identification was reliable and not the result of the situation. Although three months had passed between the time Booth waited on Middleton at Wal–Mart and the time he

identified Middleton in the courthouse hallway, longer intervals have been held not to render identifications unreliable. *See, e.g., Littleton,* 649 S.W.2d at 227 (four months); *State v. Charles,* 612 S.W.2d 778, 780 (Mo. banc 1981), *cert. denied,* 454 U.S. 972, 102 S.Ct. 522, 70 L.Ed.2d 392 (1981) (eight months).

Even though Booth could not conclusively identify Middleton from the photograph police showed him after the murder, he did indicate that the photo resembled Middleton. The fact that Booth could not conclusively identify Middleton from a photograph does not necessarily diminish the reliability of his identification of Middleton upon actually seeing him. A photograph and a face to face meeting are two different things. The trial court did not err by overruling Middleton's motion to suppress the identification testimony. Point 1 is denied.

### 2. Mental Health Records of Douglas Stallsworth (Middleton's Point 2)

■ Middleton claims the trial court erred by denying his request to review the mental health records of Douglas Stallsworth. A pretrial hearing was held to determine whether Stallsworth was mentally competent to testify. The state presented the testimony of two psychiatrists who stated that Stallsworth was competent to testify. The court found him competent, and he testified at trial. Before trial, Middleton requested disclosure of all mental health records concerning Stallsworth.

■ The state must disclose evidence favorable to the accused when the evidence is material to guilt or to punishment. *Rule 25.03(5).* "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *State v. Shafer,* 969 S.W.2d 719, 740–41 (Mo. banc 1998) *cert. denied,* — U.S. —, 119 S.Ct. 419, 142 L.Ed.2d 340 (1998). The trial judge conducted an *in camera* review of the department of mental health's records and determined that these records need not be produced. This Court also has reviewed

the department of mental health's records. The trial court did not err by refusing to order the disclosure of Stallsworth's mental health records. Nor was Middleton prejudiced by the failure to have access to these records. Point 2 is denied.

### 3. Prosecutor's Guilt–Phase Closing Argument (Middleton's Point 3)

Middleton claims the trial court erred by overruling two objections made during the state's guilt-phase closing argument. The court did overrule one of Middleton's objections. However, in response to the other objection the court asked the jury to recall the evidence. Middleton did not object to the court's remedy to this second objection; we, therefore, review his appeal on this issue under plain error. Middleton also appears to argue in this appeal that the entire closing argument was inappropriate. All three issues arise from inferences the State argued from the evidence admitted at trial.

■ Both the state and the defense are entitled to argue reasonable inferences from the evidence. *State v. Kenley,* 952 S.W.2d 250, 272 (Mo. banc 1997), *cert. denied,* — U.S. —, 118 S.Ct. 892, 139 L.Ed.2d 878 (1998); *State v. Barton,* 936 S.W.2d 781, 783 (Mo. banc 1996). A trial court maintains broad discretion in the control of closing arguments. *Barton,* 936 S.W.2d at 783. An argument does not require reversal unless it amounted to prejudicial error. *State v. Johnston,* 957 S.W.2d 734, 750 (Mo. banc 1997); *see, e.g., Shurn v. Delo,* 177 F.3d 662 (8th Cir.1999).

#### a. Preserved Claim of Improper Closing Argument

■ At trial, defense counsel objected to two statements made by the prosecutor during the guilt-phase closing argument. The first relates to the prosecutor's suggestion that Pinegar was in Middleton's pickup truck when Middleton drove past Pinegar's fiancé Priscilla Hobbs:

> Prissy is heading home and she comes across this white 4x4 only a mile away

leaving the area of her residence, and John Middleton is ... driving and there is someone in the middle seat. Al Pinegar is leaning down on the passenger side.

Middleton's counsel objected that there was no evidence that Pinegar was in the truck. The trial judge overruled the objection. The statement is a reasonable inference from the evidence. Based on the evidence at trial, Pinegar could have been transported from his home in Davis City, Iowa, to the site of his murder near Ridgeway, Missouri, in Middleton's truck. A further reasonable inference could be that Pinegar was ducking down in the truck to hide from his fiancé Hobbs, because Hobbs had told Pinegar that he would have to choose between family and drugs and she associated Middleton with drugs. Further, Hodges was in the truck sitting in the center, not on the passenger's side. This allows an inference that she was making room for Pinegar. The trial court did not err.

### b. Unpreserved Claim of Improper Closing Argument

■■■■ The second statement that was the subject of a defense objection concerns the fact that Pinegar was shot once with "number five" shotgun pellets and twice with "double-ought" shotgun pellets:

> [Pinegar is] running and the defendant gets out of the vehicle, and he shoots [Pinegar] in the back with a shot gun .... it's a transiential wound to the upper right shoulder, it's the bird shot, the number five—the ammunition that Al previously had in his gun.

Middleton objected and the trial judge asked the jury to recall the evidence on this issue. Middleton did not object to the trial court's remedy; we, therefore, review this statement under plain error. *Rule 30.20.* " '[R]elief should be rarely granted on assertion of *plain error* to matters contained in closing argument, for trial strategy looms as an important consideration and such assertions are generally denied without explication.' " *State v. Clay,* 975 S.W.2d 121, 134 (Mo. banc 1998), *cert. de-*

nied, —— U.S. ——, 119 S.Ct. 834, 142 L.Ed.2d 690 (1999) (quoting *State v. Wood,* 719 S.W.2d 756, 759 (Mo. banc 1986)) (emphasis in original). Under plain error review, a conviction will be reversed for improper arguments only when it is established that the argument had a decisive effect on the outcome of trial and amounts to manifest injustice. *State v. Lyons,* 951 S.W.2d 584, 596 (Mo. banc 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1082, 140 L.Ed.2d 140 (1998).

■■■■ The evidence indicated that Pinegar's shotgun was the murder weapon. Also in evidence was the fact that Pinegar brought his shotgun with him everywhere he went. The jury could infer that the gun was already loaded and that Middleton first fired the gun before reloading with the "double ought" shot he had purchased from Booth. Even if the argument was an unreasonable inference, it did not create a manifest injustice to Middleton's defense. The trial court did not err.

### c. Unpreserved Claim As to the Entire Argument

In his brief on appeal, Middleton quotes lengthy excerpts from the closing argument and appears to argue that the entire closing argument was improper. The remaining statements of the state's closing argument are reviewed under plain error review since no objection was made at trial nor were the issues preserved in any other manner. The closing argument did not contain unreasonable inferences based on the facts at trial and did not cause any manifest injustice to Middleton. *See, e.g., State v. Carter,* 955 S.W.2d 548, 558 (Mo. banc 1997); *State v. Roberts,* 948 S.W.2d 577, 592 (Mo. banc 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 711, 139 L.Ed.2d 652 (1998).

Point 3 is denied.

### 4. Evidence Seized by Search Warrant (Middleton's Point 4)

Middleton asserts that the trial judge erred by refusing to suppress evidence seized at Middleton's residence through a

search warrant. The evidence Middleton sought to suppress included a leather jacket, a broken sunglass lens, a bill of sale for a pickup truck, and a list of local law enforcement officers and their radio frequencies. Middleton challenges the existence of probable cause to support the warrant and the validity of seizures of property made pursuant to the warrant.

### a. Validity of the Search Warrant

 Middleton argues that the affidavit supporting the warrant contains information received from a "confidential informant" who was not independently verified as a reliable source and, therefore, information provided by that informant should have been disregarded when considering whether probable cause existed to issue the warrant. This Court gives "great deference on review to the initial judicial determination of probable cause made at the time of the issuance of the warrant, and we reverse only if that determination is clearly erroneous." *State v. Berry*, 801 S.W.2d 64, 66 (Mo. banc 1990). The presence or absence of probable cause is determined by reviewing the affidavit in support of the application for the warrant. *State v. Laws*, 801 S.W.2d 68, 70 (Mo. banc 1990). "[T]he veracity and basis of knowledge of informants need no longer be established, ... the judge issuing the warrant 'is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Laws*, 801 S.W.2d at 69. "[P]ersonal knowledge of the informant corroborated through other sources is enough to establish probable cause.'" *Berry*, 801 S.W.2d at 66.

 The affidavit presented to the court established that the information received from the confidential informant was extensively corroborated by facts previously discovered by the police during the murder investigation. For example, the informant's statement that he saw Pinegar's shotgun, a twelve-gauge Mossberg with a pistol grip, at Middleton's residence matched the description of the shotgun given to police by Pinegar's fiancé. The informant's description of the white pickup truck parked at Middleton's residence matched the description of the truck Pinegar's fiancé saw Middleton driving on the day Pinegar disappeared. Additionally, the informant's report that Middleton's girlfriend was named "Maggie" was consistent with the fact that the woman Booth waited on at Wal–Mart signed the name "Maggie States" on the return form. Middleton's statement, recounted by the informant, that his pickup broke down "near Ridgeway" was consistent with the fact that Pinegar's body was discovered near Ridgeway. Probable cause existed to justify the issuance of a search warrant.

### b. Validity of Seizures Made Pursuant to the Warrant

Middleton claims the seizures of the sunglass lens, leather jacket, bill of sale, and list of officer frequencies were the result of a search that exceeded the scope of the warrant. The warrant directed the officers to search Middleton's residence. It listed the items subject to seizure as "one box 12 gauge pump shotgun with pistol grip; one box of Federal Premium shotgun shells ... four Federal Premium 12 ga., 00 buck shotgun shells; methamphetamine; and marijuana."

 While walking up the driveway leading to Middelton's house, an officer found and seized a broken sunglass lens that was lying on the ground. This officer knew that a broken pair of sunglasses had been found at the murder scene. In the yard outside the house was a light blue Ford LTD. Officers saw through the window of the LTD a brown leather jacket that matched a piece of brown leather discovered at the murder scene. The officers seized the jacket. Inside Middleton's house, officers found a bill of sale for the white pickup truck and a list of officer's names and their radio frequencies.

■ "[A]n officer who is lawfully located in a place from which the object can plainly be seen may seize the object so long as there is probable cause to believe that the object is connected to the crime." *State v. Johnston*, 957 S.W.2d 734, 742 (Mo. banc 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1171, 140 L.Ed.2d 181 (1998). The bill of sale, list of officer frequencies, and sunglass lens were properly seized pursuant to the search warrant.

■ Under the automobile exception to the warrant requirement, police may search a vehicle and seize contraband found if there is probable cause to believe that the vehicle contains contraband and exigent circumstances necessitate the search. *State v. Lane*, 937 S.W.2d 721, 722 (Mo. banc 1997); *State v. Milliorn*, 794 S.W.2d 181, 183 (Mo. banc 1990). "As a practical matter, exigent circumstances exist whenever an automobile is involved; the mere possibility that the vehicle can be moved is generally sufficient justification for a warrantless search." *Milliorn*, 794 S.W.2d at 183 (citing *Cady v. Dombrowski*, 413 U.S. 433, 441–42, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973)). The leather jacket was properly seized under the automobile exception to the warrant requirement. The trial court did not err by overruling Middleton's motion to suppress this evidence.

Point 4 is denied.

### 5. Evidence Seized without a Search Warrant (Middleton's Point 5)

■ While the search of Middleton's house was in progress, one of the officers walked to a field across the road from the house. He found a white pickup truck that matched the description of a vehicle described in the warrant affidavit. The truck was stuck in mud, and the officer noticed signs that someone had been trying to get it out of the mud. The officer looked into the window of the truck and saw a small square of adhesive on the dashboard that appeared to match the adhesive on the back of a small plastic clock that had been discovered at the murder scene. The officer opened the door of the truck and removed a piece of the dashboard containing the adhesive square. Middleton claims that the adhesive square should not have been admitted into evidence because it was unlawful for the officer to open the door and remove the adhesive square without obtaining a warrant.

Again, the automobile exception to the warrant requirement allows an officer to search a vehicle and seize contraband when probable cause exists. *Lane*, 937 S.W.2d at 722. The fact that this vehicle was stuck in mud does not render the exception inapplicable. The searching officer testified that it was apparent that someone had been in the process of trying to remove the vehicle from the mud. The truck was parked in an open field and was vulnerable to any person who chose to enter it and remove possible evidence. Under these circumstances, the seizure of the adhesive square was proper. Point 5 is denied.

### 6. State's Cross–Examination of Dr. Murphy (Middleton's Point 6)

■ During the penalty phase Middleton called Dr. Murphy, who testified that Middleton's mental responsibility for Pinegar's murder and for the murders of Randy Hamilton and Stacey Hodge was reduced as a result of methamphetamine use. In reaching this conclusion, Dr. Murphy substantially relied on statements given to him by Middleton. During direct examination, Dr. Murphy testified that he believed that Middleton had been truthful in many of his responses:

Q: ... how do we know that when Mr. Middleton, or anybody else for that matter, is answering those questions that they are answering truthfully?

A: You really don't know.... In all of the tests there was no indication that Mr. Middleton was trying to fake anything.

\* \* \*

Q: ... In all the tests you did with Mr. Middleton, did you see any signs of malingering, or faking bad, or not being motivated to do well?

A: Right. None of that.

On cross-examination, the state sought to impeach Dr. Murphy's conclusion that Middleton had been truthful with him.

Q: And throughout the course of your evaluating [Middleton], the credibility of what the defendant is telling you and whether or not he is malingering, did you also evaluate the credibility of his denial of these three murders?

A: I certainly did.

\* \* \*

Q: Doctor, when the defendant denied to you having murdered Alfred Pinegar, did you believe that he was being truthful with you at the time?

A: No, I did not.

Q: When the defendant denied killing Randy Hamilton, did you believe he was being truthful at that time?

A: No.

Q: When the defendant denied killing Stacey Hodge, did you believe the defendant was being truthful with you at that time?

A: No.

Middleton claims the trial court erred by overruling his objection to the state's questions.[1]

 "Generally, expert testimony is inadmissible if it relates to the credibility of witnesses because this constitutes an invasion of the province of the jury." *State v. Whitmill,* 780 S.W.2d 45, 47 (Mo. banc 1989). However, Dr. Murphy was not asked to give his opinion about Middleton's credibility as a witness. Middleton did not testify at his trial. Dr. Murphy was asked for his evaluation of the truthfulness of Middleton's statements made to

him during psychiatric testing. "Wide latitude is afforded the cross-examination of witnesses to test qualifications, credibility, skill or knowledge, and the value and accuracy of the expert's opinion." *State v. Brooks,* 960 S.W.2d 479, 493 (Mo. banc 1997), *cert. denied,* — U.S. ——, 118 S.Ct. 2379, 141 L.Ed.2d 746 (1998). This is especially true in the cross-examination of mental health experts, because "the factual basis for psychiatric testimony is particularly important." *State v. Parker,* 886 S.W.2d 908, 927 (Mo. banc 1994), *cert. denied* 514 U.S. 1098, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995).

Moreover, having opened the door by asking Dr. Murphy his opinion about Middleton's truthfulness concerning methamphetamine use, Middleton cannot now complain about the state's cross-examination of Dr. Murphy about his opinion as to Middleton's truthfulness concerning whether he murdered Pinegar, Hodge, and Hamilton. *See State v. Barnett,* 980 S.W.2d 297, 307 (Mo. banc 1998).

The trial court did not err by overruling Middleton's objections to the State's questioning of Dr. Murphy. Point 6 is denied.

**7. Request of Directed Sentence of Life Without Parole** (Middleton's Point 7)

 Middleton claims the trial court erred by overruling his motion for a directed sentence of life without parole when a juror was excused during the penalty phase. During the presentation of evidence in the penalty phase, Juror Gray asked to be excused because of family difficulties. Gray was replaced by an alternate juror who had been sequestered throughout the trial. In *State v. Johnson,* 968 S.W.2d 123, 132 (Mo. banc 1998), this Court approved the replacement of a juror with an alternate in the penalty phase. We found that section 494.485, RSMo 1994, allows such a substitution. Section 565.030.2, which requires that a first-de-

---

1. In the Table of Contents section of Middleton's brief, he states that the trial court erred by overruling his objections to the questioning

of Dr. Jonathan Lipman. However, in the argument portion of his brief Middleton makes no mention of Dr. Lipman.

gree murder defendant receive a guilt phase and a penalty phase "before the same trier," does not prohibit the use of an alternate juror before deliberations begin. *Johnson*, 968 S.W.2d at 132 ("The only statutory exception to the use of alternate jurors applies when deliberations have already begun."). The trial court did not err by overruling Middleton's motion for a directed sentence. Point 7 is denied.

### 8. Proposed Jury Instruction 17B (Middleton's Point 8)

■ Middleton argues that the trial court erred by rejecting his proposed penalty phase Instruction 17B. Middleton's Instruction 17B contained one statutory mitigating circumstance that was not submitted to the jury in Instruction 17. That circumstance was "[w]hether John Middleton acted under extreme duress or under substantial domination of another person." Middleton put on evidence that his girlfriend Hodges had "a really big influence" over him. This evidence, however, is not sufficient to establish that Middleton acted under "extreme duress" or "substantial domination" in trying to cause Middleton to kill Pinegar. *See State v. Clemons*, 946 S.W.2d 206, 222 (Mo. banc 1997); *State v. Copeland*, 928 S.W.2d 828, 853–54 (Mo. banc 1996). The trial court did not err by rejecting Middleton's Instruction 17B. Point 8 is denied.

### 9. Venirepersons Stricken for Cause (Middleton's Point 9)

■ Middleton alleges that the trial court erred by sustaining the state's challenge for cause to venirepersons Vineyard and Schnirch. Venirepersons may be excluded from the jury when their views would prevent or substantially impair their ability to perform their duties as jurors in accordance with the court's instructions and their oath. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *State v. Rousan*, 961 S.W.2d 831, 839 (Mo. banc 1998), *cert. denied*, —— U.S. ——, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998). A juror may be stricken for cause if it appears that he or she "cannot consider the entire range of punishment, apply

the proper burden of proof, or otherwise follow the court's instructions in a first degree murder case." *Rousan*, 961 S.W.2d at 839; *State v. Debler*, 856 S.W.2d 641, 645–46 (Mo. banc 1993).

■ "The qualifications of a prospective juror are not determined conclusively by a single response, 'but are made on the basis of the entire examination.'" *State v. Kreutzer*, 928 S.W.2d 854, 866 (Mo. banc 1996), *cert. denied*, 519 U.S. 1083, 117 S.Ct. 752, 136 L.Ed.2d 689 (1997) (quoting *State v. Brown*, 902 S.W.2d 278, 285 (Mo. banc 1995), *cert. denied*, 516 U.S. 1031, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995)). The trial court is in the best position to evaluate a venireperson's commitment to follow the law and is vested with broad discretion in determining the qualifications of prospective jurors. *Rousan*, 961 S.W.2d at 839; *Kreutzer*, 928 S.W.2d at 866. A trial court's "ruling on a challenge for cause will not be disturbed on appeal unless it is clearly against the evidence and constitutes a clear abuse of discretion." *Kreutzer*, 928 S.W.2d at 866.

### a. Venireperson Vineyard

■ During voir dire by both the state and the defense, Vineyard testified that he could not follow the law requiring that the state prove guilt and statutory aggravating circumstances beyond a reasonable doubt. Instead, he stated that he would require proof beyond all doubt. In response to the state's question about aggravating circumstances, Vineyard said: "I'm not so sure there doesn't have to be extra weight besides reasonable doubt of an aggravating circumstance for me to live with that—that I in my mind killed a man. . . . I have to be absolutely sure, not just beyond a reasonable doubt." In answer to the defense's question of whether he could follow the judge's instructions on the burden of proof in deciding Middleton's guilt, Vineyard answered: "I don't think so. I think I've got to have something beyond that. . . . I don't think I could give some-

body the death penalty unless I was absolutely sure."

The record supports the trial court's ruling. Vineyard's statements provided a basis for the trial court to conclude that Vineyard's views on the burden of proof would substantially impair his ability to follow the court's instructions. *See Rousan,* 961 S.W.2d at 839–40.

### b. Venireperson Schnirch

■ During the state's voir dire, Schnirch expressed her agreement with another venireperson who had said she was unable to impose the death sentence. When examined by the defense, Schnirch said: "It would be very difficult for me to consider, I guess, the death penalty, if I was one of those who had to determine that. I could go through the guilt or innocence phase, and that would be very difficult for me. That's about as good as I can do."

■ The record supports the trial court's ruling. "A juror's equivocation about his ability to follow the law in a capital case together with an unequivocal statement that he could not sign a verdict of death can provide a basis for the trial court to exclude the venireperson from the jury." *Rousan,* 961 S.W.2d at 840; *see also State v. Smith,* 944 S.W.2d 901, 914 (Mo. banc 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 377, 139 L.Ed.2d 294 (1997). The trial court did not abuse its discretion by striking venireperson Schnirch for cause.

Point 9 is denied.

### 10. Questioning of Prospective Jurors (Middleton's Point 10)

■ Middleton argues that the trial court erred by sustaining the state's objections to defense voir dire questions about the feelings and opinions of certain venirepersons on various issues of law. "A trial court's ruling on whether to allow a voir dire question will be reversed only for an abuse of discretion." *State v. Hall,* 955 S.W.2d 198, 203 (Mo. banc 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1375, 140 L.Ed.2d 523 (1998). In order to demonstrate an abuse of discretion in the conduct of voir dire, the complaining party must show a real probability of prejudice. *Kreutzer,* 928 S.W.2d at 861. "It is permissible for a court to prohibit broad questioning about how a juror thinks or feels." *State v. Chaney,* 967 S.W.2d 47, 57 (Mo. banc 1998). Errors in the limitation of voir dire questions are cured if the questions were not directed to a prospective juror who actually sat on the jury. *State v. Skillicorn,* 944 S.W.2d 877, 893 (Mo. banc 1997).

During the voir dire, the court sustained the state's objections to questions asked of Venireperson Gray and Venireperson Bailey, who both ultimately served as jurors. First, Venireperson Maloney stated that he believed the criminal justice system could be manipulated. Counsel then asked Venireperson Gray whether he had "any feelings like Mr. Maloney about the court system and the criminal justice system," and whether there are "particular instances that [he] feel[s] like the death penalty should be the punishment." Counsel also asked Venireperson Bailey, "Are you someone who feels that the death penalty is a just punishment?" and "Have your opinions about the death penalty changed over the years?"

■ These questions were open-ended and were not relevant to the question of whether a venireperson can serve as a fair and impartial juror. They focused upon the venirepersons' "feelings." "The relevant inquiry [during voir dire] is whether a prospective juror can follow the law." *Chaney,* 967 S.W.2d at 57. We decline Middleton's invitation to reexamine *Kreutzer,* 928 S.W.2d at 864, which controls this issue. The trial court did not abuse its discretion by sustaining the state's objections to these questions. Point 10 is denied.

### 11. Evidence Admitted at Guilt Phase (Middleton's Points 11 & 12)

■ Middleton complains that the trial court erred by overruling his objec-

tion to the admission of a videotape of the crime scene, a photograph of Pinegar's partially decomposed body, and fragments of teeth and jaw bone found next to Pinegar's body. Middleton claims the evidence was highly prejudicial and only marginally probative. The trial court is vested with broad discretion in determining the admissibility of photographs and other evidence. *State v. Hampton,* 959 S.W.2d 444, 453 (Mo. banc 1997); *State v. Murray,* 744 S.W.2d 762, 772 (Mo. banc 1988) *cert. denied,* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988). "Photographs, although gruesome, may be admitted where they show the nature and location of wounds, where they enable the jury to better understand the testimony, and where they aid in establishing any element of the state's case." *Murray,* 744 S.W.2d at 772; *see also State v. Ervin,* 979 S.W.2d 149, 161 (Mo. banc 1998). A photograph is admissible if it accurately depicts the crime scene, including issues of identity and condition and location of the body. *State v. Schneider,* 736 S.W.2d 392, 403 (Mo. banc 1987), *cert. denied,* 484 U.S. 1047, 108 S.Ct. 786, 98 L.Ed.2d 871 (1988). The same considerations pertain to video evidence. *Skillicorn,* 944 S.W.2d at 886. Jaw bone and teeth fragments are admissible to establish that the victim was shot in the face. *See State v. Davis,* 814 S.W.2d 593, 597 (Mo. banc 1991), *cert. denied,* 502 U.S. 1047, 112 S.Ct. 911, 116 L.Ed.2d 812 (1992).

The crime scene video demonstrated the position of Pinegar's body, which was lying next to a fence with one arm pointing away from the fence. This position corroborated the testimony of Douglas Stallsworth that Middleton told him he had shot Pinegar and thrown his body over a fence. The police officer used the photograph of Pinegar's body to describe to the jury the injuries he observed on Pinegar's body at the time he discovered it. Testimony that Pinegar died of a gunshot wound to the face and the presence and location of the teeth and bone were used by the state in closing argument to offer a reasonable inference that Pinegar had been lying help-less when he was shot. The crime scene was in a field of very tall grass, and the teeth and bone could not be seen from the photograph or video of the crime scene. While it is true that the evidence was grisly, "[d]efendants may not so easily escape the brutality of their own actions; gruesome crimes produce gruesome, yet probative, photographs." *State v. Feltrop,* 803 S.W.2d 1, 11 (Mo. banc 1991), *cert. denied,* 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). The trial court did not abuse its discretion by overruling Middleton's objections to the evidence. Middleton's Points 11 & 12 are denied.

**12. Expert Opinion Testimony** (Middleton's Point 13)

Middleton claims that the state's expert witness Kathleen Green, a trace evidence specialist, should not have been allowed to testify about certain physical evidence. Green's testimony concerned "physical match identification," which involves a microscopic visual examination of pieces of evidence. Green testified that a strip of brown leather fringe found at the crime scene could possibly have come from a jacket found at Middleton's residence. She also testified that a broken pair of sunglasses found at the crime scene could possibly match a sunglass lens found at Middleton's residence. She further testified that adhesive on a plastic dashboard clock at the murder seen matched a square of adhesive found in Middleton's pickup truck.

Middleton does not challenge Green's expertise or any foundational matter, see for example, *Frye v. United States,* 293 F. 1013 (1923); *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), but simply that this was an inappropriate subject matter for expert testimony. Expert testimony is admissible unless the subject of that testimony is "within the realm of the jury's common experience." *Skillicorn,* 944 S.W.2d at 892. Green's testimony involved her ex-

pert opinion as a criminalist employed by the forensic laboratory of the Missouri State Highway Patrol regarding technical matters that exceed the experience of jurors. The trial court did not err by admitting Green's testimony. Middleton's Point 13 is denied.

### 13. Motion for a Second Change of Venue (Middleton's Point 14)

Middleton contends that the trial court erred by denying his motion for a second change of venue prior to trial. He argues that an article published in a local newspaper prior to trial created a substantial risk that the jury could not be impartial. Rule 32.04(a)(1) provides that a change of venue may be ordered in a criminal jury trial if the inhabitants of the county in which the trial is to take place are prejudiced against the defendant. "The decision to grant or deny a change of venue for cause is a matter of trial court discretion, and its ruling will not be reversed absent an abuse of discretion.... A trial court abuses its discretion when the record shows that the inhabitants of the county are so prejudiced against the defendant that a fair trial cannot occur there." *State v. Kinder,* 942 S.W.2d 313, 323 (Mo. banc 1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 149, 139 L.Ed.2d 95 (1997). "In assessing the impact of potentially prejudicial publicity on prospective jurors, the critical question is not whether they remember the case, but whether they have such fixed opinions regarding the case that they could not impartially determine the guilt or innocence of the defendant." *State v. Barton,* 1999 WL 562151 (Mo. banc 1999) (No. 80931).

The record reflects that each venireperson who had heard of the case in the media was carefully questioned. Five venirepersons were removed for cause because their answers reflected that they had formed an opinion about Middleton's guilt because of their exposure to the media reports. Middleton has not established that any specific juror had fixed opinions about his guilt and threatened his right to a fair trial or that he was prejudiced in any

identifiable way in the jury selection process. *See Kinder,* 942 S.W.2d at 323–24. Pretrial publicity, alone, does not require a change of venue. The trial court did not abuse its discretion by denying Middleton a second change of venue. Middleton's Point 14 is denied.

### 14. Penalty Phase Evidence of Other Crimes (Middleton's Point 15)

Middleton claims the trial court erred by admitting a videotape of the crime scene where the bodies of Stacey Hodge and Randy Hamilton were found and a photograph of Stacy Hodge's body. He asserts that because this evidence was offered in connection with a collateral crime, its prejudicial effect outweighed its probative value. In the penalty phase of a capital trial, the character and history of the defendant, including prior crimes committed by that defendant, are admissible as relevant to the sentencing. *State v. Nicklasson,* 967 S.W.2d 596, 618 (Mo. banc 1998); *State v. Chambers,* 891 S.W.2d 93, 106–07 (Mo. banc 1994).

Middleton had not yet been convicted for the murders of Hamilton and Hodge at the time of the penalty phase of this trial. The sole account of their murders came from the testimony of Stallsworth. Stallsworth testified that Middleton had told him that he killed Hamilton and Hodge. He recounted Middleton's detailing of how he shot the victims and then placed their bodies in the trunk of a car. The videotape showing the discovery of the two bodies and the photographs used by Dr. Jay Dix to describe the victims' wounds corroborated Stallsworth's testimony. The evidence in question was used to help the jury to understand the prior acts of Middleton for the purpose of determining his punishment for the murder of Pinegar. *See Parker,* 886 S.W.2d at 924; *State v. Leisure,* 749 S.W.2d 366, 378–379 (Mo. banc 1988). The trial court did not abuse its discretion by admitting this evidence. Middleton's Point 15 is denied.

**15. Penalty Phase Evidence of Pinegar's Family** (Middleton's Points 16 & 17)

Middleton complains that the testimony of Pinegar's mother and the introduction of a photograph of Pinegar and his daughter during the penalty phase were so prejudicial that they caused the jury to sentence Middleton to death on the basis of passion rather than reason. There is no categorical prohibition on the presentation of victim impact testimony in capital cases. *Payne v. Tennessee,* 501 U.S. 808, 824, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Only when the victim impact evidence "is so unduly prejudicial that it renders the trial fundamentally unfair," does the Due Process Clause mandate relief. *Payne,* 501 U.S. at 824, 111 S.Ct. 2597. Middleton's counsel did not object to the testimony of Pinegar's mother at trial, and we review that claim for manifest injustice. Middleton's counsel did object to the photograph of Pinegar and his daughter, and we review that claim for prejudicial error.

Pinegar's mother testified that Pinegar's death left a very big hole in her heart. She showed the jury a photograph of Pinegar with his daughter. She then began to weep and was escorted from the courtroom. She was not recalled for questioning by either party. The testimony of Pinegar's mother was not inflammatory and did not cause manifest injustice to Middleton. *See Simmons,* 955 S.W.2d at 741; *Roberts,* 948 S.W.2d at 604.

We have considered Middleton's motion for production of the photograph of Pinegar and his daughter. In his motion Middleton claims that this Court cannot properly render an opinion on this point without viewing the photograph. The briefs on appeal provide a description of the photograph. Middleton describes the photograph as a picture "of Pinegar with his young daughter." This Court need not look at the actual photograph to determine whether it was unduly inflammatory. Victim-impact testimony offered at Middleton's penalty phase consisted only of that photograph and brief testimony by his mother. Far more extensive and graphic victim-impact testimony has been found not to be so unduly prejudicial that it renders the trial fundamentally unfair. The trial court did not err by admitting the photograph. *See State v. Basile,* 942 S.W.2d 342, 358 (Mo. banc 1997), *cert. denied,* ─── U.S. ───, 118 S.Ct. 213, 139 L.Ed.2d 148 (1997).

Middleton's Points 16 & 17 are denied.

**16. Proposed Penalty Phase Instructions** (Middleton's Point 18)

Middleton claims the trial court erred by refusing his requested penalty phase instructions A, B, C, D, and E. These instructions attempted to provide general guidance to the jury in its consideration of mitigating factors. He asserts that only these instructions would have ensured that the jury was given the opportunity to give full consideration to mitigating evidence. This Court has repeatedly rejected claims like Middleton's. *See Rousan,* 961 S.W.2d at 849; *Roberts,* 948 S.W.2d at 603–04; *Chambers,* 891 S.W.2d at 109. The jury was given approved instruction MAI–CR 3d 313.44A, which included all of the statutory mitigating circumstances to which Middleton was entitled. The instruction also included a catch-all paragraph stating "[y]ou should also consider any other facts or circumstances which you find from the evidence in mitigation of punishment." The trial court did not err by refusing Middleton's instructions A, B, C, D, and E. *See State v. Copeland,* 928 S.W.2d 828, 854 (Mo. banc 1996), *cert. denied,* 519 U.S. 1126, 117 S.Ct. 981, 136 L.Ed.2d 864 (1997). Middleton's Point 18 is denied.

**17. Request for an Additional Continuance** (Middleton's Point 21)

Middleton claims the trial court erred by denying his repeated requests for a second continuance on the grounds that his counsel had inadequate time to prepare. The decision to grant or deny a continuance is within the sound discretion of the trial court. *State v. Schaal,* 806 S.W.2d 659, 666 (Mo. banc

1991), *cert. denied,* 502 U.S. 1075, 112 S.Ct. 976, 117 L.Ed.2d 140 (1992). To receive relief on this issue Middleton must present "a very strong showing of abuse and prejudice." *State v. Taylor,* 944 S.W.2d 925, 930 (Mo. banc 1997). Inadequate preparation does not justify a continuance where counsel had ample opportunity to prepare. *Taylor,* 944 S.W.2d at 930.

Middleton's case went to trial about one year and four months after the information was filed against him. His counsel received one six-month continuance in which trial was rescheduled from October 7, 1996 to February 24, 1997. Three attorneys represented Middleton. One of those attorneys began to represent him the day after the information had been filed against him. The second attorney entered the case approximately eight months before trial, and the third attorney approximately five months before trial. This is not a case where the state failed to disclose key evidence to the defense until the morning of trial such as in the cases cited by Middleton. *See State v. Whitfield,* 837 S.W.2d 503, 506–08 (Mo. banc 1992); *State v. Childers,* 852 S.W.2d 390, 391–92 (Mo. App.1993).

Although the state endorsed twenty-three witnesses only three weeks prior to trial, many of these were simply "chain-of-custody" witnesses verifying the proper handling of physical evidence. Others had already been deposed by the defense or had testified in pretrial proceedings. Still others had previously been endorsed by the state or the defense or their identities were revealed in police reports. Middleton has not established that the trial court erred or that he was prejudiced by the trial court's denial of his continuance request. Middleton's Point 21 is denied.

**18. Definition of First–Degree Murder** (Middleton's Point 23)

Middleton claims the trial court erred by overruling his motion to dismiss the charge of first-degree murder. Middleton asserts that he received constitutionally inadequate notice that his actions constituted first-degree murder because there is no meaningful distinction between the mental state required for first-degree murder and that required for second-degree murder either in the statutory definitions contained in sections 565.020.1 and 562.016.3 or in this Court's decisions. This Court dealt with this same issue in *Rousan,* where we held that "the statutory language of chapter 565 and this Court's decisions clearly distinguish first from second degree murder." *Rousan,* 961 S.W.2d at 851–52. Middleton's Point 23 is denied.

**19. Age of Jurors** (Middleton's Point 24)

Middleton claims the trial court erred by overruling his motion to quash the petit jury panel. He argues that section 494.425's exclusion of people between the ages of 18 and 21 from the jury panel deprived him of a jury of his peers. This Court has consistently upheld the validity of this statute. *See, e.g., State v. Blankenship,* 830 S.W.2d 1, 16 (Mo. banc 1992); *State ex. rel. McNary v. Stussie,* 518 S.W.2d 630, 637 (Mo. banc 1974). This is because "it is highly speculative that the outlook of the allegedly excluded persons would be different from those a few years older." *Blankenship,* 830 S.W.2d at 16. Middleton's Point 24 is denied.

**20. Prosecutorial Discretion to Seek the Death Penalty** (Middleton's Point 25)

Middleton argues that the trial court erred by overruling his motion to dismiss the information against him. He claims that prosecutorial discretion to choose whether to seek the death penalty resulted in an arbitrary and capricious imposition of the death sentence in this case. The existence of prosecutorial discretion in seeking the death penalty did not render capital punishment unconstitutional in this case. *Carter,* 955 S.W.2d at 562; *Smith,* 944 S.W.2d at 923; *Simmons,* 944 S.W.2d at 190–91. Middleton's Point 25 is denied.

**21. Reasonable Doubt Instruction** (Middleton's Point 26)

Middleton complains that the trial court erred by refusing to modify the reasonable

doubt jury instruction. He claims that the instruction given to the jury regarding reasonable doubt lessened the state's burden of proof. The trial court gave approved jury instructions MAI–CR3d 300.02 and 302.04. The appropriateness of these instructions has been upheld by this Court. *Johnson,* 968 S.W.2d at 133; *State v. Owsley,* 959 S.W.2d 789, 796 (Mo. banc 1997). Middleton's Point 26 is denied.

## B. OTHER ISSUES ON APPEAL

### 1. Alleged Defects in the Trial Transcript (Middleton's Point 22)

 Middleton asserts that he is entitled to a reversal of his conviction and sentence because the transcript of his trial contains defects and is incomplete. An appealing party is entitled to a full and complete transcript for the appellate court's review. However, a record that is incomplete or inaccurate does not automatically warrant a reversal of the appellant's conviction. *Jackson v. State,* 514 S.W.2d 532, 533 (Mo.1974). Middleton is entitled to relief on this point only if he exercised due diligence to correct the deficiency in the record *and* he was prejudiced by the incompleteness of the record. *State v. Borden,* 605 S.W.2d 88, 92 (Mo. banc 1980).

### a. Due Diligence

 Rule 30.04(h) allows an appellant to request a stipulation of the parties or an order by the appellate court to supplement the file in order to cure omissions. "Nothing suggests an attempt [by Middleton] to obtain by stipulation or motion the substance of the missing testimony." *Borden,* 605 S.W.2d at 92.

### b. Prejudice

 Further, Middleton failed to establish that the alleged trial record omissions or inaccuracies prejudice his appeal. *See State v. Dunn,* 817 S.W.2d 241, 244 (Mo. banc 1991), *cert. denied,* 503 U.S. 992, 112 S.Ct. 1689, 118 L.Ed.2d 403 (1992); *Borden,* 605 S.W.2d at 92. Middleton's trial lasted three weeks and his transcript is nearly four thousand pages long. Middleton cites thirty-four instances of omission in the transcript. During the pretrial proceedings and the trial, participants made statements that were inaudible to the court reporter. Often, the court reporter immediately stopped the proceedings and asked for a clarification for the record. We will not address every omission cited by Middleton as many of them were corrected by the court reporter at the time of trial and even more of them are trivial and clearly immaterial to his appeal. In a few instances, during voir dire and pretrial proceedings, the reporter did not request clarification and no correction was made. One incident involved questioning of a venireperson who sat on the jury. Three incidents involved trial testimony. An examination of those instances reveals that they did not prejudice Middleton's appeal.

Venireperson Anielak was questioned about his relationship with his brother, who is a lawyer. Anielak testified that his brother practices corporate law and that he has never discussed criminal law with his brother. He also said: "I don't ——————— [unintelligible] my brother. [Laughter in the courtroom]." On cross-examination of state's witness John Thomas the following question and answer took place:

Q: You also have told a police officer that you knew about a Jack Lewis being over at Middleton's at one time around that period?

A: I believe ———————— [unintelligible] mentioned that.

Another omission occurred during the cross-examination of state's witness Gary Moore, who identified the body of Pinegar from fingerprints taken at the autopsy. Moore was asked to give the name of the previous examiner who had left her employment with the crime lab. The record reflects that Moore gave the name "Rosella B———— [unverified name]." One further incomplete statement in the transcript of the trial comes during the testimony of Dr. Suthikant, who testified that he was "certified by ——————— [unintelligible] of Psychi-

atry in general psychiatry, child and adult psychiatry and forensic psychiatry." In his brief on appeal, Middleton concedes that the evidence at trial established Dr. Suthikant's competency.

Middleton's Point 22 is denied.

**2. Proportionality Review** (Middleton's Point 19)

Section 565.035 requires us to independently review the sentence of death to determine (1) whether it was imposed under the influence of passion or prejudice, or any other arbitrary factor; (2) whether there was sufficient evidence to support the finding of a statutory aggravating circumstance and any other circumstance found; and (3) whether the sentence was excessive or disproportionate to the penalty imposed in similar cases.

There is no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. *See Carter,* 955 S.W.2d at 562; *Simmons,* 944 S.W.2d at 190.

We review the trial court's findings to determine if the evidence supports–beyond a reasonable doubt—the existence of an aggravating circumstance and any other circumstance found. *Section 565.035.3(2); Brown,* 902 S.W.2d at 294. The jury found two statutory aggravating circumstances as a basis for considering the death sentence. It found that the murder committed was wantonly vile, horrible or inhuman in that it involved depravity of mind. *Section 565.032.2(7).* The jury also found that Middleton murdered Pinegar for the purpose of attempting to conceal his dealing of methamphetamine. *Section 565.032.2(15).*

■ The evidence supports, beyond a reasonable doubt, that Pinegar's murder was wantonly vile, horrible or inhuman in that it involved depravity of mind. *See State v. Barnett,* 980 S.W.2d 297, 309–10 (Mo. banc 1998); *State v. Tokar,* 918 S.W.2d 753, 773 (Mo. banc 1996). The jury was instructed that it could made a determination of depravity of mind "only if you find that the defendant killed Alfred Pinegar as a part of defendant's plan to kill more than one person and thereby

exhibited a callous disregard for the sanctity of human life." The evidence supports a finding that Middleton killed Pinegar as part of a plan to eliminate all of the police informants on his "hit list." Only ten days before he killed Pinegar, Middleton killed Stacey Hodge and Randy Hamilton, again to eliminate all those who could be a potential "snitch."

■ The evidence also supports, beyond a reasonable doubt, that Middleton killed Pinegar in an attempt to conceal his felony offense of drug dealing. *See State v. Roll,* 942 S.W.2d 370, 379 (Mo. banc 1997), *cert. denied,* — U.S. —, 118 S.Ct. 378, 139 L.Ed.2d 295 (1997). Stallsworth testified that Middleton told him that he killed Pinegar because he was worried that Pinegar may be a drug informant who would turn Middleton in to the police. Thomas testified that Middleton told him that something had to be done to the potential drug informants. Middleton told another acquaintance that Pinegar was on his "hit list" as being a potential drug informant.

In determining whether the sentence of death is excessive or disproportionate, we are to consider "the crime, the strength of the evidence and the defendant." *Section 565.035.3(3).* We have found a sentence of death appropriate where the murder was committed to prevent the victim from serving as a potential witness against the murderer. *See, e.g., State v. Taylor,* 929 S.W.2d 209, 223 (Mo. banc 1996); *Parker,* 886 S.W.2d at 934; *State v. Shurn,* 866 S.W.2d 447, 467 (Mo. banc 1993). We have also found the death sentence appropriate when the fatal blow is dealt to the victim while the victim is lying injured and helpless, which the facts seem to indicate here. *See, e.g., Tokar,* 918 S.W.2d at 773.

■ The strength of the evidence and Middleton's violent behavior support a sentence of death. Physical evidence found at the crime scene, such as the leather fringe, the broken sunglasses, and the plastic clock, link Middleton to Pinegar's murder.

Booth's testimony concerning Middleton's purchase of certain types of ammunition also link Middleton to the murder. Hobbs' testimony that she saw Middleton driving away from Pinegar's home on the day of the murder further implicate Middleton. The testimony of Stallsworth and Thomas indicate that Middleton admitted to them that he killed Pinegar.

Penalty phase evidence also established that Middleton committed a virtually identical pair of murders ten days prior to killing Pinegar. This means that within two weeks' time Middleton killed three people because he believed that two of them might give evidence to the police about his drug dealing. The third victim, Stacey Hodge, was killed simply because of her association with one of the potential informants. The circumstances surrounding Middleton's murder of Pinegar reveal Middleton's depraved character. Middleton walked into Wal–Mart, with the man he planned to murder, and bought the ammunition used to murder him. Only two hours after the murder, he returned to the Wal–Mart to exchange the unused portion of the ammunition. These facts reveal that Middleton rationally and methodically planned and executed the murder of Pinegar. Middleton's sentence is neither excessive nor disproportionate. Middleton's Point 19 is denied.

### 3. Meaningful Review under 565.035.3(3) (Middleton's Point 20)

Middleton complains that the proportionality review mandated by section 565.035.3(3) fails to provide meaningful review and violates his procedural due process rights. This Court has recently rejected this argument. *See Johnson,* 968 S.W.2d at 134–35; *Owsley,* 959 S.W.2d at 799; *Weaver,* 912 S.W.2d at 522. Missouri's system of death sentence review is not unconstitutional. *Ramsey v. Bowersox,* 149 F.3d 749, 754 (8th Cir.1998) ("Missouri's proportionality review does not violate the Eighth Amendment, due process, or equal protection of the laws."). Middleton's Point 20 is denied.

## IV. CONCLUSION

The judgment is affirmed.

All concur.