

# SUPREME COURT OF MISSOURI
## en banc

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | *Opinion issued November 5, 2024* |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | No. SC99869 |
| | ) | |
| RICHARD DARREN EMERY, | ) | |
| | ) | |
| Appellant. | ) | |

### APPEAL FROM THE CIRCUIT COURT OF ST. CHARLES COUNTY
The Honorable Michael J. Fagras, Judge

Richard Emery appeals a judgment finding him guilty of four counts of first-degree murder and imposing the death penalty for each count. This Court has exclusive appellate jurisdiction pursuant to article V, section 3 of the Missouri Constitution. The judgment of conviction is affirmed.

At trial, Emery acknowledged he intentionally killed K.K., her mother J.M., and K.K.'s eight-year-old daughter Z.K. and 10-year-old son J.K. He contended only that he did not deliberate prior to those murders. The jury rejected Emery's argument and, on appeal, he does not claim there was insufficient evidence for the jury to find he deliberated prior to each of the four murders. In fact, the evidence of his deliberation was overwhelming. Accordingly, on appeal, Emery claims only that the circuit court erred in striking a potential juror for cause, in admitting certain evidence during both the guilt and

penalty phases, in failing to correct the prosecutor's closing argument, and by exhibiting "religious bias" against Emery in sentencing him to death. This Court rejects each of these claims.

## BACKGROUND

Emery began dating K.K. in the summer of 2017. He moved in with K.K. and her two children in December 2017. A year later, K.K.'s mother, J.M., began staying with them while she recovered from hip surgery.

## I.      Guilt Phase – Evidence of the Murders

On December 28, 2018, Emery arrived home from work around 4:30 p.m., ate dinner, and had a couple of glasses of wine. Around 7 p.m., he went to a bar for a poker tournament. There, Emery drank seven beers and one shot but otherwise acted normally over the next four hours. At 11:11 p.m., Emery got in his truck and drove home.

At 11:53 p.m., J.M. called 911, saying, "he shot us, he's beating us up and shooting" and "he has a gun." J.M. also said, "I think he shot my daughter and now he's at the door." Screams and gunshots were then heard in the background before everything went quiet. Police were dispatched immediately. As Officer Z.F. approached the address, he saw a white pickup truck in the driveway. The truck was empty, but the running lights were on and the engine was idling. Officer Z.F. observed a white male, later determined to be Emery, exit the front door of the house, turn and lock it, and walk to the idling pickup truck. His demeanor was calm and casual. As Emery backed out of the driveway and drove down the street, Officer Z.F. radioed the truck's description and

2

plate number and asked other officers to stop the truck. Officer Z.F. proceeded to the house, where he and other officers forced entry through the locked front door.

Officers found K.K. inside the door of the primary bedroom lying in a pool of blood. She had suffered two gunshot wounds at close range. One shot entered her left shoulder blade and exited through her right side, and the other entered the top of her head and traveled straight down her body. She was conscious and making noise when the officers arrived. The officers attempted to aid her, but her condition deteriorated quickly. Paramedics arrived and attempted to get her to the hospital, but she died on the way there.

The primary bedroom and bathroom showed signs of a struggle. There was an open gun safe in one nightstand. It contained two beer cans but no gun. Bloody footprints led from the primary bedroom to a second bedroom. The door to that bedroom had been forced open. Inside, officers found the bodies of J.M., J.K., and Z.K. J.M.'s body was just inside the doorway, suggesting she was attempting to block Emery's entrance. J.K.'s body was on the bed, and Z.K.'s body was between the bed and the wall. J.M. and Z.K. were each shot once, and J.K. was shot three times. The wounds on all three victims indicated they had been shot from very close range.

## II.  Guilt Phase – Emery's Attempted Escape

Meanwhile, Officers K.S. and J.B. responded separately to Officer Z.F.'s radio call and located Emery's truck still in the neighborhood. Officer J.B. activated his emergency lights, but Emery ignored both police vehicles and continued to drive away at normal speed. Emery then made a right turn onto a poorly lit street and stopped. Officers J.B. and K.S. followed and stopped their respective vehicles behind Emery's

3

truck. Officer J.B. opened his door with his gun drawn and repeatedly ordered Emery to put his hands out the window. Emery did not comply. Suddenly, in one swift motion, Emery reached toward the center of the truck, opened the driver's side door, exited the vehicle, raised a pistol and began firing at the officers. Neither officer was hit, and both returned fire. When Emery's gun was out of ammunition, he ran between two houses and into the woods. Officers found an assault rifle and duffel bag with more than 900 rounds of ammunition inside the truck. Officers searched the area where Emery fled and found a 9-millimeter pistol with no bullets remaining. Blood on the pistol contained DNA consistent with the DNA of K.K., J.K., and J.M. All of the bullets and casings found at the murder scene and next to Emery's truck were fired from this pistol.

Soon after this shootout, a 911 call came in describing an assault and attempted carjacking at a nearby location. The victim of that incident, A.K., was leaving a family holiday party. As she walked to her vehicle, she heard someone running behind her. A.K. quickly got into her vehicle, but, before she could lock the door, Emery opened it and attacked her. During the attack, Emery repeatedly stated: "I gotta get out of here." Emery was not panicked or shouting but was "very deliberate and very insistent." When A.K. did not comply, Emery began swinging a knife, stabbing her seven times. While Emery was attacking A.K., he told her to move to the passenger seat so they could get out of there. A.K. was able to push Emery away and close the door. Emery then began walking away, again effecting a casual manner.

An hour or more later, Emery walked into a gas station. He had been shot twice, presumably in the shootout with the police, and was bleeding. An employee asked him if

4

he needed an ambulance or wanted him to call 911, and Emery responded he did. Police soon arrived and arrested Emery while paramedics treated his wounds.

The state charged Emery with four counts of first-degree murder, four counts of armed criminal action related to the homicide counts, three counts of first-degree assault, three counts of armed criminal action related to the assault counts, and one count of first-degree attempted robbery. All counts other than the four first-degree murder counts were severed pursuant to section 565.004.[1]

## III. Guilt Phase – Evidence of Deliberation

At trial on the murder counts, Emery acknowledged he intentionally killed K.K., her mother and her two small children. However, he argued the jury should find him guilty only of second-degree murder because, according to Emery's expert witness, Emery was in a "dissociative state" and lacked the ability to deliberate prior to killing his victims. According to Emery, based on a text exchange with K.K. earlier in the day, he returned home expecting to have sex with her. When he arrived, however, J.K. tried to show Emery the LEGO set he had built. Emery dismissed him rudely. This led to an argument with K.K., who eventually slapped Emery and told him to leave the house. In response, Emery said he pushed K.K. down and punched her in the head. She yelled for someone to call the police. Emery testified he next remembered holding his gun, which had been locked in the safe, but did not remember crossing to the safe, entering the

---

[1] All statutory references are to RSMo 2016 unless otherwise noted.

5

combination, or taking out the gun. He remembered K.K. attempting to take the gun from him, the gun going off twice, and K.K. falling to the ground after the second shot.

After he shot K.K., Emery testified he knew J.M. was on the phone with the 911 operator. He remembers kicking open the door to the second bedroom and acknowledges he shot J.M. first, though he claims not to remember doing so. Emery testified he shot Z.K. next and remembered shooting J.K., who was curled up in a ball on the bed. Emery claimed it was like being a "character in a video game" – he was aware of his actions but not in control of them. After those killings, Emery testified he went back into the primary bedroom, stepping over K.K., to change his clothes. Emery testified he does not remember getting his assault rifle or the duffel bag of ammunition. Emery did not deny he shot at the officers as he tried to escape or that he assaulted A.K. and attempted to steal her car for the same reason.

At the conclusion of the guilt phase of Emery's trial, the jury found him guilty of all four counts of first-degree murder. In doing so, the jury found beyond a reasonable doubt Emery deliberated prior to killing each of his victims. Taken in the light most favorable to the jury's verdict,[2] the evidence supporting deliberation was overwhelming. Emery came home expecting to have sex with K.K. Instead, Emery found himself in an argument with her over his brusque response to J.K and the excitement J.K. showed over

_____

[2] *State v. Hosier*, 454 S.W.3d 883, 898 (Mo. banc 2015) (holding, when reviewing the sufficiency of the evidence, that the Court "does not reweigh the evidence but, rather, considers it in the light most favorable to the verdict and grants the state all reasonable inferences").

his Christmas present. Emery began to beat K.K., but, when he heard K.K. shout to J.M. to call the police, the nature of his attack and the future of all four victims changed.

Emery could have stopped the argument by leaving the bedroom or even the house. He chose not to. Instead, he decided to kill K.K. and the three other witnesses. He crossed to his gun safe, entered the combination, and took out his loaded pistol. At any point in that sequence, he could have stopped. He chose not to. He shot twice at K.K., missing her both times. She pleaded with him to stop. He chose not to. He moved to very close range and shot again, hitting K.K. in the back. That shot did not kill her, but the fact that his next shot entered the top of her skull indicates she was down – and likely incapacitated – before Emery chose to fire the fatal shot.

With K.K. fatally wounded, Emery could have stopped, even summoned help for her, but he chose not to. Emery could have fled, and his path to the front door was clear. He chose not to. There were witnesses still alive. He stepped over K.K., who was struggling to call out to her mother and children, and walked down to the second bedroom where he could hear J.M. on the phone with the 911 operator. Faced with a locked door and knowing J.M. may already have had time to summon the police, Emery again could have fled. He chose not to. Instead, he forced open the bedroom door and executed J.M., who was blocking his way, with a single shot at very close range. Having fulfilled his plan to end the 911 call, and knowing police may already be on their way, Emery could have left the house. He chose not to. There were two witnesses still alive and cornered in that bedroom. He moved to close range and shot them both. His first shot killed Z.K., but he had to shoot J.K. three times before being sure he was dead.

7

Every one of Emery's choices – to cross to the gun safe, enter the combination, and take out the gun; to kill K.K. instead of leaving; to kill J.M. instead of leaving; to kill both children instead of leaving; and in each case to advance to close range and fire multiple shots when necessary to ensure the victims died – are the quintessence of deliberation. *See State v. Cole*, 71 S.W.3d 163, 169 (Mo. banc 2002) ("Deliberation requires only a brief moment of 'cool reflection' and may be inferred from the fact that a defendant had the opportunity to terminate an attack after it began.").

But there was even more evidence of deliberation. Emery did not flee his gruesome crimes in a panic. Instead, he calmly returned to the primary bedroom, again stepping over K.K. who was still struggling to stay alive, and changed his clothes. He then reloaded his pistol and collected his assault rifle and the rest of his ammunition before leaving the scene. Even then, his flight was careful and deliberate. After starting his truck, he had the presence of mind to go back and lock the front door in an effort to delay discovery of his crimes and give him more time to escape.

Shortly after driving away from the house, Emery was followed by two police cars, one with its emergency lights flashing. He did not panic and speed away, a choice that almost certainly would have ended with his arrest or worse. Instead, Emery drove at normal speed until he found a darkened street where he could try and ambush the officers to continue his escape. Emery turned down that street and, choosing to ignore the officers' directions, jumped from his truck and began firing. His shots were well-aimed, and, were it not for the car door shielding Officer J.B., Emery likely would have killed or

8

seriously wounded him. When his pistol ran out of ammunition, Emery ran into the woods.

His ability to make plans and carry them out continued. He stalked A.K., intending to use her car to escape and take her with him if necessary. A.K. foiled that plan. Emery chose to walk away, leaving A.K. with seven stab wounds to live or die on her own. Within hours, wounded and knowing he was out of options, Emery submitted to arrest.

Even though Emery's conduct after the last of his four murders is not direct evidence of deliberation, his actions – reflecting coolly on his situation, developing plans to escape arrest, and carrying out those plans – proved he had the capacity to deliberate immediately after the murders and throughout his attempted escape. From that, the jury was entitled to draw the inference that, if Emery could coolly and methodically deliberate on his options and act on his choices immediately *following* the murders, he had the ability to (and did) coolly and methodically deliberate on his options and act on his choices while sequentially *committing* those murders. *See State v. Tisius*, 92 S.W.3d 751, 764 (Mo. banc 2002) (holding "conduct after the murders can also support a finding of deliberation"). The jury was entitled to reject Emery's self-serving testimony and that of his expert, i.e., that Emery was aware of his actions but could not control them, and the jury plainly did so.

## IV. Penalty Phase

During the penalty phase, the state presented testimony from N.B. (J.K. and Z.K.'s aunt), from D.L. (K.K.'s stepmother), and from F.M. (K.K.'s father and J.M.'s

9

ex-husband), all of whom spoke of the impact Emery's crimes had on them and their family. The state also offered testimony from Officers Z.F. and other officers, who spoke about the trauma they suffered as a result of responding to this gruesome scene. Finally, the state offered testimony from A.K. and Officers K.S. and J.B., who described the impact Emery's actions during his attempted escape had on them. All three suffered, and are still suffering, from having to live with the memory of Emery's attacks.

Emery presented testimony of several family members, including his parents, stepparents, aunt, son, and two family friends. He offered two witnesses who served with him in the Air Force. Emery called two women with whom he had been romantically involved before his relationship with K.K. Finally, he presented expert testimony from a psychiatric epidemiology and public health researcher.[3]

At the conclusion of the penalty phase, the jury recommended death sentences for each count of first-degree murder. For each of the four murders, the jury unanimously agreed the following statutory aggravating circumstance had been proved beyond a reasonable doubt:

> Whether the murder of [victim] involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find:

---

[3] Emery had sexual encounters with men in his adolescence and again in his 30s. This researcher offered evidence that members of the LGBTQ+ community experience heightened levels of stress relating to the stigma associated with their sexual identity and that this stress can lead to increased incidents of substance abuse, depression, anxiety, and suicide.

> That the defendant killed [victim] as a part of defendant's plan to kill more than one person and thereby exhibited a callous disregard for the sanctity of all human life.

§ 565.032.2(7); MAI-CR 4th 414.40, Notes on Use 8(B)[7].

The circuit court followed the jury's recommendation and sentenced Emery to death for each of the four counts of first-degree murder.

## ISSUES RAISED ON APPEAL

Emery alleges 13 points of error: the circuit court erred in striking Venireperson 463 for cause (Emery's point 1); the circuit court erred in admitting certain evidence during the guilt phase of trial (Emery's points 2, 3, 4, 5, 6, and 7); the circuit court erred in allowing A.K. and Officers K.S. and J.B. to testify during the penalty phase of trial (Emery's points 8, 9, and 10); the circuit committed plain error by not interceding in the prosecutor's allegedly improper closing argument (Emery's point 11); and the circuit court erred in considering Emery's lack of religious faith when sentencing him to death (Emery's point 12). Finally, this Court conducts an independent proportionality review of Emery's sentence pursuant to section 565.035.3(3) (Emery's point 13).

## I. Jury Selection

Emery argues the circuit court erred in striking Venireperson 463 for cause. According to Emery, the court should not have struck this potential juror because he indicated he could meaningfully consider the death penalty as a sentence. The circuit court's ruling is affirmed, however, because it was not an abuse of discretion for the circuit court to strike Venireperson 463 for cause after he stated his personal views could substantially impair his ability to consider the death penalty.

11

## A.     Standard of Review

"The circuit court's ruling on a challenge for cause will not be disturbed on appeal unless it is clearly against the evidence and constitutes a clear abuse of discretion."[4] *State v. Wood*, 580 S.W.3d 566, 580 (Mo. banc 2019) (internal quotation omitted).  A ruling constitutes an abuse of discretion when it is "clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration."  *State v. Taylor*, 134 S.W.3d 21, 26 (Mo. banc 2004).

## B.     Analysis

"[A] criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause."  *Uttech v. Brown*, 551 U.S. 1, 9 (2007).  However, "the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes."  *Id.*  Therefore, in a case in which the death penalty is a possible sentence, the court may strike a prospective juror for cause if the juror indicates he or she would not be able to impose the death penalty.  *Id.*

It is improper to strike a potential juror merely because they have general objections to the death penalty on moral or religious grounds.  *Witherspoon v. Illinois*,

---

[4]   Defense counsel objected to the circuit court's decision to strike Venireperson 463, stating: "[Venireperson 463] should be retained.  His answers were sufficiently clear upon rehabilitation by the defense."  Counsel included this issue in Emery's motion for new trial.  Emery's claim regarding Venireperson 463 is properly preserved for appellate review; therefore, abuse of discretion is the appropriate standard of review.

391 U.S. 510, 518-21 (1968). A juror may be excluded for cause, however, if the juror's views would "prevent or substantially impair" the performance of his or her duties as a juror in accordance with his or her oath and the court's instructions. *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (internal quotation omitted); *see also State v. Johnson*, 284 S.W.3d 561, 580 (Mo. banc 2009) (holding a juror may be struck if the juror's ability to consider the death penalty is substantially impaired). This standard "does not require the juror's bias be proved with unmistakable clarity." *Wainwright*, 469 U.S. at 424 (internal quotation omitted). In applying this standard, "deference must be paid to the trial judge who sees and hears the juror" because there "will be situations whe[n] the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law" even though the record might not clearly demonstrate such substantial impairment. *Id.* at 425-26; *see also State v. Deck*, 303 S.W.3d 527, 535 (Mo. banc 2010) ("'Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors.'" (quoting *Uttecht*, 551 U.S. at 9)).

Venireperson 463's statements were – at best – equivocal regarding his ability to consider the death penalty fairly. Originally, he indicated he would be able to consider the death penalty as a sentence. As he was questioned further, however, Venireperson 463 confirmed he was "somewhat strongly opposed" to the death penalty. At one point, Venireperson 463 indicated he would "feel like a hypocrite" if he voted to impose the death penalty. When asked again if his views would prevent him from giving the death

13

penalty meaningful consideration, Venireperson 463 admitted: "It could." During defense counsel's questioning of Venireperson 463, the prospective juror stated: "I lean strongly towards the life without parole" but "if it came down to it and all the other jurors were for the death penalty I could listen to it and consider what they had to say about it." Ultimately, Venireperson 463 reiterated he would feel like a hypocrite and "would definitely push for … life."

Despite defense counsel's attempts to rehabilitate Venireperson 463, it was not an abuse of discretion for the circuit court to strike him for cause. His answers provided a sufficient basis for the court to conclude the prospective juror's views would substantially impair the performance of his duty as a juror to fairly consider a death sentence. The venireperson confirmed this when he stated his opposition to the death penalty could prevent him from giving that sentence meaningful consideration. To be sure, Venireperson 463 gave conflicting answers about this issue, at one point indicating he could consider the death penalty, but such equivocation – by itself – is a sufficient basis for the court to conclude the potential juror's ability to consider the sentence was substantially impaired. *Tisius,* 92 S.W.3d at 763 ("'Whe[n] there is conflicting testimony regarding a prospective juror's ability to consider the death penalty, the trial court does not abuse its discretion by giving more weight to one response than to another and in finding that the venireperson could not properly consider the death penalty.'" (quoting *State v. Roberts,* 948 S.W.2d 577, 597 (Mo. banc 1997))).

In sustaining the state's motion to strike, the circuit court indicated it had considered both the totality of Venireperson 463's responses and his demeanor. The

14

court specifically noted Venireperson 463's demeanor as he stated he would feel like a hypocrite for considering the death penalty. This Court must give deference to the trial judge who saw and heard the potential juror. *Deck*, 303 S.W.3d at 535. Accordingly, it was not an abuse of discretion for the circuit court to strike Venireperson 463 for cause.

## II.    Evidence Admitted in Guilt Phase

Next, Emery asserts the circuit court erred in admitting certain evidence during the guilt phase of his trial. First, Emery objects to the admission of Exhibits 16 and 18, body-camera footage from the officers who first arrived at the scene of the murders. According to Emery, the footage was more prejudicial than probative, and the admission of both videos was unnecessarily cumulative. Second, Emery claims the circuit court erred in admitting testimony regarding the shootout between Emery and Officers K.S. and J.B., as well as A.K.'s testimony that Emery stabbed her and attempted to steal her vehicle. According to Emery, any probative value of this evidence was outweighed by unfair prejudice because the shootout and stabbing were uncharged acts and were not relevant to the four murders. Because it was not an abuse of discretion for the circuit court to admit any of this evidence, Emery's points are denied.

### A.    Standard of Review

The circuit court "has broad discretion to admit or exclude evidence during a criminal trial, and error occurs only when there is a clear abuse of this discretion."[5]

---

[5]  Emery's counsel properly preserved his objection to the admission of Exhibits 16 and 18. Counsel objected to both videos, arguing they were more prejudicial than probative, and included the Sixth, Eighth, and Fourteenth amendments of the United States Constitution (and article 1, sections 10, 18(a), and 21 of the Missouri Constitution)

*Wood*, 580 S.W.3d at 574 (internal quotation omitted).  The circuit court "abuses its discretion only if its decision to admit or exclude evidence is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration."  *Id.* (internal quotation omitted).

"The general rule in Missouri is that evidence must be both logically and legally relevant [] to be admissible."  *Tisius*, 92 S.W.3d at 760.  "Evidence is logically relevant if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, or if it tends to corroborate evidence which itself is relevant and bears on the principal issue of the case."  *Id.* (internal quotation omitted).  "Legal relevance weighs the probative value of the evidence against its costs – unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness."  *State v. Anderson*, 76 S.W.3d 275, 276 (Mo. banc 2002); *see also Wood*, 580 S.W.3d at 575 (same).

Even such an error, alone, will not justify reversal.  "This Court will reverse the [circuit] court's decision only if there is a reasonable probability that the error affected

---

among the bases for the objection.  Counsel requested a continuing objection to the bodycam videos and specifically objected to Exhibit 18 as cumulative.  Emery's counsel also properly preserved his objection to the evidence pertaining to the shootout and attempted carjacking.  Counsel objected to the evidence as it was introduced and included his objection in a motion for new trial.  Therefore, abuse of discretion is the appropriate standard of review for all of these points.

16

the outcome of the trial or deprived the defendant of a fair trial." *Wood*, 580 S.W.3d at 574.

**B.      Exhibits 16 and 18 Were Properly Admitted**

Emery claims that the circuit court erred in admitting the two bodycam videos shown to the jury in the guilt phase of his trial. This Court holds both videos were logically and legally relevant, and the circuit court did not err in admitting them both into evidence.

The circuit court is "vested with broad discretion in the admission of photographs and videos." *State v. Middleton*, 995 S.W.2d 443, 462 (Mo. banc 1999). "A photograph is admissible if it accurately depicts the crime scene, including issues of identity and condition and location of the body." *Id.* The same is true for video evidence. *Id.* A photograph or video is logically relevant if it shows "the scene of the crime, the identity of the victim, the nature and extent of the wounds, the cause of death, the condition and location of the body, or otherwise constitute[s] proof of an element of the crime or assist[s] the jury in understanding the testimony." *State v. Strong*, 142 S.W.3d 702, 715-16 (Mo. banc 2004) (internal quotation omitted).

Exhibits 16 and 18 clearly meet the first prong of the relevance test – logical relevance. Police and paramedics are shown working to save K.K. as she struggled to call out for Z.K. It is a reasonable inference that K.K. was in the same condition mere minutes earlier when Emery stepped over her to go kill her mother and children, stepped over her again to change his clothes, and stepped over her a third time to flee the scene.

These and other details captured in these videos tend to prove Emery had the ability to (and did) deliberate before shooting each of the four victims.

Emery argues these videos were not legally relevant because their graphic nature created such great prejudicial effect that it outweighed whatever slight probative value the videos may have had. This Court disagrees. The scene was horrific because Emery's crimes were horrific. It is well established that, "'if photographs are gruesome, it is simply because the crime itself was gruesome.'" *Id*. at 716 (quoting *State v. Ervin*, 979 S.W.2d 149, 161 (Mo. banc 1998)). For evidence to be legally irrelevant, it is not mere prejudice that must outweigh the probative value of the evidence but ***unfair*** prejudice. *Anderson*, 76 S.W.3d at 276. A photograph or video does not create unfair prejudice merely because it depicts a terrible scene. Portrayals of gruesome crimes necessarily will be gruesome, and this prejudicial effect is not so unfair as to render the otherwise logically and legally relevant evidence inadmissible, particularly when (as here) the identity of the killer was not disputed. *See Strong*, 142 S.W.3d at 721 (holding "[g]ruesome crimes produce gruesome, yet probative, photographs, and a defendant may not escape the brutality of his own actions" (internal quotation omitted)); *State v. Davis*, 318 S.W.3d 618, 640 (Mo. banc 2010) (holding video and stills taken from the video "were potentially prejudicial, but that prejudice arose from the gruesome nature of [defendant's] crimes, not from any action of the State in the method of presenting the footage and photographs").

Emery contends there was little probative value to the videos because the only contested issue at trial was whether he deliberated before committing the murders.

18

According to Emery, the state could have shown evidence of deliberation using still photographs clipped from the video. The defense, however, does not get to decide how the state will prove its case. *State v. Clemons,* 643 S.W.2d 803, 805 (Mo. banc 1983) (noting "the state must sustain its burden [and] it should not be unduly limited as to the manner of satisfying this quantum of proof"). Both videos were logically and legally relevant in the manner offered, and the circuit court's decision to admit them was not an abuse of discretion.

Additionally, Emery is incorrect in arguing the videos had only slight probative value. Exhibits 16 and 18 are videos taken from the body cameras of Officer Z.F. and J.W., respectively, who responded to the victims' residence barely minutes after Emery left. The videos present a full picture of the scene, including the layout of the house, the identity of the victims (one of whom was still alive when the officers arrived), the nature and extent of their wounds, and the condition and location of their bodies. All of this is relevant to proving the crime, and much of it helps prove Emery's deliberation. For example, both videos show K.K. suffered multiple gunshot wounds. *See Strong,* 142 S.W. 3d at 717 (holding deliberation may be inferred from multiple wounds); *Tisius*, 92 S.W.3d at 764 (holding the jury may infer deliberation from multiple wounds and victims). Three times Emery stepped over K.K. as she struggled to stay alive. The fact that Emery ignored her plight is also proof of deliberation. *Strong*, 142 S.W.3d at 717 (noting "failure to seek medical help for a victim strengthens the inference that the defendant deliberated"). Finally, one of the videos corroborates Officer Z.F.'s testimony that Emery stopped to lock the front door of the house. The fact that Emery took time to

19

lock the door before fleeing is evidence of his careful planning and decisionmaking abilities, i.e., his ability to deliberate.

Emery argues that, even if Exhibit 16 was properly admitted, Exhibit 18 was inadmissible because it was substantially the same as Exhibit 16 and, therefore, was unnecessarily cumulative. "Evidence is said to be cumulative when it relates to a matter so fully and properly proved by other testimony as to take it out of the area of serious dispute." *Black v. State*, 151 S.W.3d 49, 56 (Mo. banc 2004) (internal quotation omitted). Though "an appellate court will normally defer to a trial court's determination as to what evidence fits within this rule," the circuit court may not reject evidence as cumulative when it "goes to the very root of the matter in controversy or relates to the main issue, the decision of which turns on the weight of the evidence." *Id.* (internal quotation omitted).

Officers Z.F. and J.W. traveled different paths through the house before arriving at the primary bedroom. From there, even though much of Exhibits 16 and 18 depict the same scenes, they are not identical. Exhibit 18 shows more of the murder scenes than Exhibit 16. But, even where the videos overlap, they are not cumulative. Bodycam videos are not carefully shot documentaries. They simply depict what was in front of the officer at a given moment and, as a result, can be confusing and difficult to track. Having two such videos from two different viewpoints aids the jury in understanding both videos by helping establish where each officer was and where that officer's camera was pointing.

20

No witnesses remained alive to tell the jury about these murders. This heightened the need for the jury to visualize the layout of the house and appreciate how the movements Emery made – and the choices they reflect – provided strong evidence of deliberation. The circuit court reasonably concluded both videos helped the jury form this understanding and draw that inference. Because both videos were logically and legally relevant to many issues (including deliberation) and not unnecessarily or unfairly cumulative, the circuit court did not err in admitting them both into evidence.

Even if Emery had shown it was error to admit one or both of these videos, which he has not, he failed to show "a reasonable probability that the error affected the outcome of the trial or deprived [Emery] of a fair trial." *Wood*, 580 S.W.3d at 574. "When the prejudice resulting from the improper admission of evidence is only evidence-specific and the evidence of guilt is otherwise overwhelming, reversal is not required." *State v. Barriner*, 34 S.W.3d 139, 150 (Mo. banc 2000).

The guilt phase of Emery's trial lasted nine days. The jury heard from nearly 50 witnesses and viewed more than 1,000 exhibits, including other (unchallenged) exhibits showing graphic depictions of the crime scene. As a result, even if either or both Exhibits 16 and 18 were improperly admitted, this Court holds there is no likelihood that either or both of these videos "so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence." *Id*. (internal quotation omitted); *see also State v. Schneider*, 736 S.W.2d 392, 403 (Mo. banc 1987) (noting that, "while the photographs are not pleasant, 'it is difficult

21

to imagine how such photographs could conceivably have 'inflamed' the minds of the jury beyond the point to which they were otherwise inflamed by the ... evidence'" (quoting *State v. Duisen,* 428 S.W.2d 169, 173 (Mo. banc 1967))).  Accordingly, Emery's points are denied.

### C.  Evidence of Emery Shooting at Police and Stabbing A.K. Was Properly Admitted

As he was driving away from K.K.'s home, Emery saw Officer K.S.'s and Officer J.B.'s police vehicles trailing him, one with its emergency lights flashing.  Rather than pulling over, Emery kept driving away from the murder scene at ordinary speed.  He then turned down a dark street, ignored the officers' instructions, leapt from the truck, and began firing at them.  When Emery's gun was empty, he ran into the woods.  A short time later, Emery saw A.K. walking toward her vehicle and assaulted her in an attempt to steal her vehicle to aid in his escape.  In the process, he stabbed A.K. seven times.

Emery claims the circuit court erroneously admitted testimony and other evidence describing the shootout and stabbing because those acts[6] – though criminal – were not the crimes for which he was being tried at the time.  These acts, however, were parts of a continuous sequence of events beginning before the murders and ending with his arrest.

---

[6] Emery refers to these repeatedly as "uncharged acts."  This is misleading, however, because Emery was charged with attempting to shoot Officers K.S. and J.B., assaulting A.K., and attempting to steal A.K.'s vehicle, but those charges were severed from the present trial on the four first-degree murder charges.  *See* § 565.004.1 (providing, subject to exceptions not relevant here, no charge of first-degree murder may be tried together with any charge other than first-degree murder).  Emery is correct, however, that he was not on trial here for these acts, nor had he (at that time) been convicted of committing them.

Moreover, Emery's actions and decisions while attempting to flee arrest demonstrate he was fully able to deliberate mere minutes after the murders. Therefore, this evidence supports the inference he also was able to deliberate in the course of those murders. Accordingly, this Court holds the circuit court did not err in admitting evidence of Emery attempting to flee and avoid the consequences of the crimes he had committed only minutes before.[7]

"The general rule concerning the admission of evidence of uncharged crimes, wrongs, or acts is that evidence of prior uncharged misconduct is inadmissible for the purpose of showing the propensity of the defendant to commit such crimes." *State v. Morrow*, 968 S.W.2d 100, 107 (Mo. banc 1998) (internal quotation omitted). However, "evidence of uncharged crimes that are part of the circumstances or the sequence of events surrounding the offense charged" may be "admissible to present a complete and coherent picture of the events that transpired." *Id.* (internal quotation omitted).

In *Morrow*, the defendant was on trial for first-degree murder. *Id*. at 104. During trial, the circuit court allowed evidence of uncharged crimes, including another robbery

---

[7] The state contends Emery's points 4 and 6 are multifarious because they challenge the circuit court's decision to admit "a multitude" of evidence concerning the shootout and attempted carjacking in addition to Officers J.B.'s testimony and A.K.'s testimony (which are the subjects of points 5 and 7, respectively). Points 4 and 6 are multifarious in the sense they challenge rulings regarding multiple (unspecified) pieces of evidence, but the points challenge rulings made roughly at the same time regarding evidence all offered for the same purpose and subject to the same objection. The more serious defect is that Emery concedes some of this evidence was properly admitted, but that the circuit court "crossed the line" at some (unspecified) point. The Court exercises its discretion to review these points, however, as the defects of which the state complains merely highlight the lack of merit in Emery's claims. *Cedar Cnty. Comm'n v. Parson*, 661 S.W.3d 766, 772 (Mo. banc 2023).

23

and murder the defendant perpetrated hours before the murder for which he was on trial. *Id.* at 107. This Court held the uncharged crimes were admissible to "present to the jury a complete and coherent picture" of the charged offense. *Id.* According to this Court, both the charged and uncharged crimes were part of the same "drug binge and crime spree." *Id.* Therefore, even though the defendant "would have liked to limit the focus of the jury's attention to only five of the many crimes he committed during the crime spree, those crimes alone would not have fully and fairly presented a complete and coherent picture of the crimes charged and the whole truth to the jury." *Id.* This Court went on to state the evidence of the uncharged crimes supported the contested issue of whether the defendant deliberated before committing the charged murder. *Id.* at 108. The evidence of the uncharged acts showed the defendant was "undertaking acts that involved thought and deliberation" and proved the defendant was not "reduced to an automaton." *Id.*

This case is on all fours with *Morrow*. Emery's shootout with the officers occurred within minutes of the murders, and his attempted carjacking of A.K. occurred within half an hour of those crimes. As a result, the shootout and stabbings were even more tightly connected to the murder of K.K. and her family than were the acts in *Morrow*. Emery committed these acts while actively fleeing from the murders and for the purpose of evading arrest for them. *See State v. Jasper*, 486 S.W.2d 268, 271 (Mo. banc 1972) (holding the defendant's flight from the robbery constitutes a continuation of the robbery). Evidence of Emery's flight and efforts to avoid arrest were essential to give the jury a complete picture of what happened. *See State v. Skillicorn*, 944 S.W.2d 877, 887 (Mo. banc 1997) (holding evidence of threats made hours after the murder was

24

admissible as "a continuation of the sequence of events that presents a coherent picture of [defendant's] crime" and was "particularly relevant and connected to the crime charged [because it] occurred only a few hours after the murder took place [and was committed]… with the same guns used in the perpetration of [the first victim's] murder"), *overruled on other grounds by Joy v. Morrison*, 254 S.W.3d 885 (Mo. banc 2008).

Emery does not dispute that some evidence of the shootout and attempted carjacking was admissible. According to Emery, however, the nature and extent of this evidence overshadowed the evidence of the murders and needlessly inflamed the jury. This Court disagrees. The only disputed issue at trial was whether Emery deliberated prior to killing K.K., her mother, and her two small children. The evidence of Emery's flight and the crimes he committed in the process of trying to get away were highly probative of this question and, specifically, in undermining Emery's self-serving testimony that he was aware of his actions but could not control them. *See Hosier*, 454 S.W.3d at 895 (holding evidence of the "methodology of flight" is "probative as to the quality and depth of this consciousness" of guilt (alteration omitted)); *Skillicorn*, 944 S.W.2d at 887 (holding evidence of a threat made hours after the murder "helped establish [defendant's] deliberation on [victim's] murder" because, "[i]f [defendant] had not deliberately become involved with [victim's] murder … he likely could have distanced himself" from his accomplice who also joined him in the threat).

The evidence from A.K. and Officers J.B. and K.S. showed Emery was cool and calm as he planned and re-planned ways to escape and put those plans into action. He was fully in command of his actions in the 30 minutes after he left the murder scene. The

25

jury was entitled to draw an inference from the deliberation Emery exhibited during the shootout and stabbings that he was capable of deliberating (and did so) the very short time earlier when he committed the murders. The greater the evidence, the more compelling the inference. Emery complains that, at some point, the evidence becomes more prejudicial than probative but fails to identify where that line is.[8] Identifying that line and weighing the probative value against any unfair prejudice is the day-to-day work of circuit courts. This Court will not find error in such a calculation absent a clear showing that this discretion was abused. *Wood*, 580 S.W.3d at 574. Accordingly, the circuit court did not err in admitting the evidence of what occurred during Emery's flight from the murders even though his actions were also crimes.

Even if Emery had shown the introduction of some or all of this evidence was error, he failed to show there is a "reasonable probability that the error affected the outcome of the trial or deprived the defendant of a fair trial." *Id*. During the guilt phase of the trial, the state introduced an immense amount of evidence supporting Emery's convictions for first-degree murder. And as noted above, Emery concedes that at least some of the evidence of the shootout and stabbing was admitted properly. Despite all

---

[8] If the objection is that the legal relevance, probative-prejudice balance has shifted based on the continued introduction of evidence, the party opposing the introduction of the evidence must make a new objection on that ground, and not rely merely on an objection made and overruled when the first such evidence was offered. *Cf. State v. Minor*, 648 S.W.3d 721, 743 (Mo. banc 2022) (noting it is "the responsibility of *the party seeking to exclude this evidence* to advise and notify the court that the *quantum* of propensity evidence – not merely its inherently prejudicial nature – has shifted the scales, making the continued onslaught of the evidence inadmissible" (emphasis in original) (Powell, J., concurring)).

that properly admitted evidence, Emery argues – because the extent of the evidence from the shootout and attempted carjacking reinforced for the jury that he fired at police officers and assaulted a woman – this evidence somehow inflamed the passions of the jury and caused them to convict when they otherwise would not have. Suffice it to say, Emery's argument ignores all the evidence (which he does not dispute) showing he shot a young woman to death in the coldest of blood and then executed her two small children and her immobilized mother. There is simply no likelihood the jury would have reached a different verdict had the evidence of the shootout and the attempted carjacking been curtailed as Emery suggests. Accordingly, even if the circuit court erred by not limiting this evidence to some extent (which it did not), Emery fails to show why that should be sufficient grounds to reverse his convictions and award him a new trial. *See Wood*, 580 S.W.3d at 574 (holding appellate courts "will reverse the trial court's decision only if there is a reasonable probability that the error affected the outcome of the trial or deprived the defendant of a fair trial").

## III. Evidence Admitted in Penalty Phase

Emery contends the circuit court erred in allowing A.K. and Officers K.S. and J.B. to testify during the penalty phase of the trial regarding the impact that the stabbings and the shootout had on them, respectively. Emery contends this evidence was inadmissible because neither of the officers nor A.K. qualified as "victims" and, therefore, could not give victim impact testimony under sections 565.030 or 557.036.3. This claim is denied. The circuit court is vested with broad discretion in determining the admissibility of evidence in the penalty phase of a trial. Even assuming these witnesses' testimony

27

needed to meet the requirements of either or both of these statutes, this Court holds they did and finds no error in allowing their testimony in this case.

### A. Standard of Review

"[T]he trial court is vested with broad discretion in determining the admissibility of evidence offered at the penalty stage of a capital case."[9] *State v. Johns*, 34 S.W.3d 93, 112 (Mo. banc 2000). Generally, the court may admit any evidence it determines would be helpful to the jury in determining what punishment should be assessed. *Id.* Such rulings will be reviewed only for an abuse of discretion. *Id.*

### B. Analysis

"A separate punishment phase exists in capital cases to permit the presentation of a wide range of evidence about the defendant's past character and conduct, while avoiding the possibility of placing prejudicial or irrelevant evidence in front of the jury before the determination of guilt or innocence." *Id.* at 113. During the penalty phase, the jury may consider evidence of a defendant's prior unadjudicated criminal conduct. *Id.* This is true whether the unadjudicated criminal conduct occurred before or after the crime at issue. *Id.* Accordingly, there is no question that the jury was entitled to hear about the shootout and attempted carjacking, both as they bear on Emery's culpability and for what they suggest about his character. The issue Emery raises is whether the jury

---

[9] Before any of the relevant witnesses testified, counsel for Emery objected, stating the witnesses were not victims or family members of a victim of the homicide. Counsel also included the issue in Emery's motion for new trial. These claims are preserved for appellate review. Therefore, abuse of discretion is the appropriate standard of review.

properly was allowed to consider how Emery's actions while attempting to escape affected those on whom he turned his violence.

Two statutes, sections 565.030 and 557.036, govern the penalty phase of trial. Section 565.030 establishes the procedure to be used during the penalty phase when a defendant has been found guilty of first-degree murder and the state has not waived the death penalty. Under this statute, a penalty phase must be held, and evidence of aggravating and mitigating factors may be introduced. § 565.030.4. This evidence "may include,[10] within the discretion of the court, evidence concerning the murder victim and the impact of the offense upon the family of the victim and others." *Id.*

---

[10] The introductory phrase "may include" (which also is found in section 557.036) immediately exposes the flawed premise of Emery's argument. Nothing in section 565.030.4 is intended to limit evidence the circuit court may properly admit in a penalty phase. The purpose of the statute is to expand the range of admissible evidence to include victim impact evidence (which, at one time, was disfavored). *See Payne v. Tennessee*, 501 U.S. 808, 822-26 (1991). The statute was not intended to limit evidence that otherwise bears on punishment. *Cf. Fujimoto v. State*, 407 S.W.3d 656, 662 (Mo. App. 2013) (collecting cases holding section 557.041 was not intended to limit evidence otherwise admissible in the penalty phase). Emery committed crimes against the two officers and A.K. as he was fleeing the murders he committed and for the purpose of escaping punishment for them. As already explained, those actions were relevant in the guilt phase of Emery's trial to give the jury a complete picture of what Emery did and to help prove deliberation. The cost of Emery's actions to the officers and A.K. was similarly admissible in the penalty phase to give the jury a complete picture of the harm Emery inflicted. If, while fleeing the police immediately after the murders, Emery had run a red light and grievously injured an innocent motorist, this Court cannot imagine anyone would argue the jury in the penalty phase should not be allowed to hear about the impact of Emery's actions on that motorist. Here, the costs to A.K. and Officers K.S. and J.B. were worse because Emery's decision to hurt them was intentional, i.e., Emery was willing to trade their lives for an increased chance to escape. Such evidence was relevant to Emery's character and the jury's task of assessing the appropriate punishment for his murders. Further, as explained below, their testimony also was admissible as victim impact evidence under sections 565.030.4 and 557.036.3.

The second statute, section 557.036, also allows for evidence supporting or mitigating punishment during the penalty phase of trial, and "[s]uch evidence may include, within the discretion of the court, evidence concerning the impact of the offense upon the victim, the victim's family and others, the nature and circumstances of the offense, and the history and character of the defendant." *Id.*

Emery argues the circuit court erred in allowing A.K. and Officers K.S. and J.B. to testify because none of them were "victims" of the charged murders and, therefore, not eligible to testify under either statute.[11] Emery's reading of sections 565.030.4 and 557.036.3, however, is too narrow. Section 565.030.4 allows "evidence concerning the murder victim and the impact of *the offense* upon the family of the victim and others." (Emphasis added). Similarly, section 557.036.3 allows for "evidence concerning the impact of *the offense* upon the victim, the victim's family and others, the nature and circumstances of *the offense*, and the history and character of the defendant." (Emphasis added). The key to both statutes is the phrase "the offense." The choice of that phrase, rather than "the murder" or "the presently charged crime," indicates "the offense" may

---

[11]  Emery argues the officers and A.K. were not "victims" as defined in section 595.200.6 and, therefore, should not be eligible to testify under either section 565.030.4 or section 557.036.3. Under section 595.200.6, a victim is defined as "a natural person who suffers direct or threatened physical, emotional or financial harm as the result of the commission or attempted commission of a crime." Emery is wrong, as all three witnesses are natural persons and all three suffered harm as a result of "a crime" Emery committed. Nothing in this definition limits "victims" to the victims of the crime being tried. Moreover, the definition of "victim" in section 595.200.6, by its own terms, applies only to that term "as used in sections 595.200 to 595.215." Therefore, the definition of "victim" found in section 595.200 has no bearing on whether the officers or A.K. could testify as "victims" under sections 565.030.4 or 557.036.

30

include more than just the elements of the crime.  Just as the jury is entitled to hear evidence in the guilt phase giving a full and complete picture of Emery's actions leading up to, during, and for the hours following the charged murders, sections 565.030.4 and 557.036.3 show that the jury is entitled to hear about the impact of all of Emery's actions during that period on those who survived.

Emery's "offense" began with the hours leading up to his decision to shoot K.K. and her family and did not end until Emery was apprehended at the gas station.  Under this broad construction of the phrase "the offense," both the officers and A.K. were among the "others" whom section 565.030.4 allows to testify concerning "the impact of the offense upon the family of the victim *and others*." (Emphasis added).  Similarly, the officers and A.K. were among the "others" whom section 557.036.3 allows to testify concerning "the impact of the offense upon the victim, the victim's family *and others*[.]" (Emphasis added).  Because the testimony of the two officers and A.K. was properly admitted under either statute and properly admitted under the circuit court's general authority to allow any evidence it believes will assist the jury in assessing the proper punishment for the crime charged, Emery's claim is denied.

As with the preceding claims, even if this Court had concluded the circuit court erred in allowing A.K. and the two officers to testify in the penalty phase, such an error would not be prejudicial.  *Minor*, 648 S.W.3d at 733 (holding "admission of evidence is prejudicial if the error so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion without the error").  The evidence in this

31

case overwhelmingly proved Emery executed K.K., her mother, and her two small children in the most conceivably wanton and vile manner. During the penalty phase, the jury heard testimony from members of the murdered victims' families describing these people and giving emotional testimony about the impact of losing three generations of their family in this senseless, brutal crime. There is simply no possibility the evidence of what Emery did to the two officers and A.K. while trying to escape arrest for these murders, or the evidence of the severe and ongoing harm those actions caused to the officers and A.K., was essential to the jury's recommendation of the death penalty such that, without this evidence, the jury would have reached a different result. Accordingly, even if the testimony of the two officers and A.K. should not have been admitted in the penalty phase, that error would not justify relief for Emery as it did not deprive him of a fair trial, and there is no likelihood it altered the outcome of this proceeding.

## IV. Penalty Phase – Prosecutor's Closing Arguments

Emery claims the circuit court committed plain error by not admonishing the state for using an improper "in the shoes of the victims" argument during closing. Emery's claim mischaracterizes the state's arguments and, therefore, is denied.

### A. Standard of Review

Counsel for Emery did not object to the prosecutor's closing arguments during trial; therefore, any claim related to the content of that argument was not preserved for appellate review. Instead, Emery asks this Court to review his claim for plain error under Rule 30.20. Plain error review is a two-step process. First, the Court must determine whether there was plain error, i.e., error that was "evident, obvious, and clear." *Minor*,

648 at 731 (internal quotation omitted). Second, if plain error is found, the Court must determine "whether the claimed error resulted in manifest injustice or a miscarriage of justice." *Id.* (internal quotation omitted). Because these two tests are so difficult to meet, "[t]his Court rarely finds plain error in closing argument, and reversal is warranted only if the defendant shows the improper argument had a decisive effect on the jury's determination." *Wood*, 580 S.W.3d at 579 (internal quotation omitted).[12]

**B. Analysis**

"Arguments for the death penalty designed to cause the jury to abandon reason in favor of passion are improper." *State v. Rhodes*, 988 S.W.2d 521, 528 (Mo. banc 1999). In that vein, when a prosecutor asks jurors to put themselves in the shoes of the victims, it is "improper personalization that can only arouse fear in the jury." *State v. Collings*, 450 S.W.3d 741, 763 (Mo. banc 2014).

---

[12] Other considerations weigh against granting plain error review of claims the state used improper arguments. *State v. McFadden*, 369 S.W.3d 727, 750 (Mo. banc 2012) ("Plain error is seldom found during closing argument of a penalty phase because the absence of an objection and request for relief means that the trial court's options are narrowed to uninvited interference with summation, which may itself constitute error." (internal quotation omitted)). In the ordinary course, the question of whether defense counsel will object during the state's argument is a matter of trial strategy. *Deck*, 303 S.W.3d at 541. If counsel decides to object, counsel also must decide which relief to request, i.e., a mistrial or that the jury simply be instructed to ignore the improper argument. That decision, too, is a matter of trial strategy. *Johnson*, 284 S.W.3d at 573. Allowing plain error review of unpreserved claims concerning the state's argument obviates the need for such strategic decisions and, therefore, encourages sandbagging such claims. Accordingly, relief is granted only when the state's impropriety was clear, open, and obvious and the appellate court is convinced the improper argument had a "decisive effect" on the outcome of the proceeding. *Wood*, 580 S.W.3d at 579.

In *State v. McFadden*, 391 S.W.3d 408, 426 (Mo. banc 2013), the defendant claimed the prosecutor used improper personalization during closing arguments. The prosecutor asked the jurors:

> Think of the terror that [the victim] went through the last moments of her life on that street. The sheer terror with him putting the gun in [the victim's] face and clicking it and laughing and [the victim] begging for her life, knowing that she was 18 years old and about to die for his pleasure.

*Id*. This Court held that argument was not improper personalization because it "did not suggest a personalized danger to the jurors or their families," nor did the prosecutor ask the juror to put themselves in the shoes of the victim. *Id.* Instead, the prosecutor merely asked the juror to empathize with the victim. *Id.*

In the present case, the prosecutor asked the jurors to imagine the scene of the shooting, and "put yourself in that room." The prosecutor also asked the jurors to imagine a number of moments such as the screaming Z.K. heard before she was killed, the smell of gunpowder in the room, and J.M. being helpless because of her hip surgery. The prosecutor described the following:

> I'm going to take you out of that room and imagine what [K.K.] is hearing as she lies fighting for her life. She hears her daughter's voice shrieking "Why? Why? Why?" "What did you say?" And that's the end. We know she heard that.

Applying *McFadden*, this Court must reject Emery's claim.[13]  Like *McFadden*, the closing argument did not ask the jurors to imagine they personally were suffering graphic aspects of the crime.  Instead, the prosecutor asked jurors to visualize the crime shown by the evidence and empathize with the victims caught up in this horribly violent episode.  Therefore, this Court holds there was no error in failing to correct the prosecutor's argument, let alone plain error, and certainly no manifest injustice.  *See McFadden*, 391 S.W.3d at 426 (rejecting an improper personalization claim because the argument did "not ask the jurors to imagine that they personally were suffering the graphic aspects of the crime," but, instead, "asked the jurors to empathize with the victims in a manner consistent with the facts of the case"); *State v. Roberts*, 948 S.W.2d 577, 595 (Mo. banc 1997) (finding it was not improper personalization to ask jurors to "[t]hink about what [the victim] went through" because it does "not suggest personal danger to the jurors").

---

[13]  In contrast, one example of improper personalization is found in *State v. Storey*, 901 S.W.2d 886, 901 (Mo. banc 1995).  There, in closing arguments, the prosecutor clearly asked jurors to imagine themselves in the victim's place.  *Id.*  The prosecutor asked the jurors to imagine

> *your* head yanked back by its hair and to feel the blade of that knife slicing through *your* flesh, severing *your* vocal cords, wanting to scream out in terror, but not being able to. Trying to breathe, but not being able to for the blood pouring down into *your* esophagus.

*Id.* (emphasis added).  This Court found the prosecutor's argument constituted improper personalization that resulted in prejudice.  *Id.*; *see also Rhodes*, 988 S.W.2d at 528-29 (finding it was improper for the prosecutor to tell jurors to imagine their necks being broken and then imagine themselves asphyxiating as a result).

## V.    The Consideration of Emery's Lack of Spirituality

Finally, Emery argues that comments the circuit court made during the sentencing hearing show the court was acting out of "religious bias" when it sentenced Emery to death because Emery had testified he was not a "spiritual" person. Emery, however, mischaracterizes the court's comments. Read in context, the circuit court exhibited no "religious bias" and did not say or suggest it was using Emery's lack of spirituality as any part of its basis for accepting the jury's recommendations and sentencing him to death. His claim is denied.

### A.    Standard of Review

Counsel for Emery did not object to the court's comments regarding Emery's lack of spirituality; therefore, the issue is not preserved for appellate review. Instead, Emery requests this Court review his claim for plain error.[14] As noted with the previous claim, plain error review requires this Court to find the circuit not only committed error, but error that was "evident, obvious, and clear." *Minor*, 648 S.W.3d at 731 (internal quotation omitted). If such an error is found, this Court will grant relief only if that error resulted in manifest injustice or a miscarriage of justice. *Id.*

### B.    Analysis

During the sentencing hearing, the circuit court stated it had spent "countless hours" reviewing the evidence in the case and spent "many sleepless nights" thinking

---

[14] Claims constructed entirely from a single, out-of-context remark by the trial judge are especially ill-suited for plain error review because a timely objection would have clarified for the defense precisely what the circuit court was – and was not – saying, thereby eliminating any concern of the sort Emery raises now.

36

about its sentencing decision, which was "an extremely hard decision to make." Before

sentencing Emery, the court made a record of its decision and reasoning. The court

reviewed the testimony of three of Emery's mitigation witnesses: Emery's son (T.E.),

Emory's stepfather, and Emery's employer. Despite all this, Emery contends the circuit

court sentenced him to death because of "improper religious bias" against him. The only

support Emery offers for this claim is the circuit court's statement: "I remember the

testimony of Mr. Emery, 'I'm not a spiritual person.'" From this, Emery asks this Court

to conclude the circuit court was unfairly prejudiced against him for his lack of

spirituality, and this "religious bias" was at least a part of the court's reason for accepting

the jury's recommendations and sentencing Emery to death.

Emery's claim is denied because the statement by the circuit court on which

Emery relies was plucked from its context, given meaning the court never intended, and

assigned an effect it did not have. Restored to its context, the circuit court stated:

> Next, I remember clearly the testimony of [T.E.], Mr. Emery's son, who
> testified. I found this young man to be very mature, spoke from his heart.
> And what I found very encouraging is here is a young man who had been
> estranged from his father, that is going on mission trips, studying to be a
> Christian counselor. I remember the testimony of Mr. Emery, "I'm not a
> spiritual person." So I could only reflect that through the parental
> upbringing of [T.E.'s] mother he had developed into a young man of high
> achievement and worth.

During the penalty phase, through his mitigation witnesses, Emery attempted to

show he suffered from borderline personality disorder, which causes him to go to extreme

efforts to avoid abandonment. In making the comments set out above, the circuit court

37

was merely stating its reasons for rejecting Emery's abandonment claim.  The court

explained:

> When I reflected back about this abandonment claim, that I did not find credible, I came to the conclusion the one that was abandoned was [T.E.], not Mr. Emery.  So I think that we could be grateful that, [T.E.] had the influence of his mother to develop how he did.

When viewed in context, it is clear the circuit court was not stating or implying

that it used Emery's lack of spirituality as a reason to sentence him to death, much less

that it was acting on the basis of some "religious bias."  As a result, the judge's

comments were not error, let alone plain error, and did not result in manifest injustice.

## VI.    Proportionality

Section 565.035 imposes an independent duty on this Court to undertake a

proportionality review to determine:

> (1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found; (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the offense, the strength of the evidence and the defendant.

§ 565.035.3.

First, there is no indication Emery was sentenced to death as a result of passion,

prejudice, or any other arbitrary factor.  Emery attempts to resurrect each of the points

rejected above and repurpose them under section 565.035.3(1) as the source of so much

passion or prejudice that it left the jury powerless to return any verdict but one

recommending the death penalty.  This Court disagrees.  As already explained, none of

these evidentiary issues was error and, even if one or more had been, none of them (nor the combined weight of them) was so prejudicial as to cast doubt on the validity of the jury's verdict.

Next, Emery seeks to augment the list of factors he claims resulted in passion or prejudice with various inconsequential matters that seemingly merited neither an objection at trial nor a claim on appeal. These include: (a) the state made a single reference to K.K.'s deceased husband, who was a Marine; (b) the 911 dispatcher was allowed to testify the call from J.M. "took a while to process"; (c) the body cam video showing J.K.'s lifeless body was shown three times; (d) the state emphasized he had shot at police and stabbed a young woman; (e) Officer J.B. testified he chose not to send his police dog after Emery because the dog "would've easily just been killed" and many jurors empathize with dogs; (f) the jury was allowed to see Emery's truck and the police vehicles staged so they could understand the relatively short distances between them; (g) Officer J.B. testified Emery had come close to shooting him in the head; (h) the state made a single reference to Z.K. and J.K.'s grandparents attending the trial; (i) after Emery characterized himself as a "screw-up," the state began his cross-exam by saying: "Well, sir, you're right. You most definitely are a screw-up"; (j) the state referred to Emery as "Darren" after being told he preferred "Mr. Emery"; and (k) the state referenced the gruesome nature of the crime scene photographs to one mitigation witness and indulged a brief bit of sarcasm with another.

This Court holds none of these issues, nor the combined effect of them, so inflamed the jury's passion or prejudice so as to suborn their will and cause them to

39

return a verdict they did not believe was supported by a reasoned view of the evidence. Such arguments discount the horror of Emery's crimes and the inescapable impact on the jury all of the other evidence in this case must have had. This point is denied.

The evidence was overwhelming that Emery methodically worked his way through K.K.'s home, firing at close range and killing everyone there. He coolly and deliberately started with K.K., shooting at her four times and hitting her twice, including the eventually fatal shot at close range that entered the top of her skull and traveled straight down her body. She struggled to hang onto life until after Emery left and the police had arrived. She heard the struggle and shots down the hall signaling the end for her mother and her two small children. Emery kicked in the door to the second bedroom, shot J.M. at close range, walked over to Z.K. (who was trying to hide between the bed and the wall) and executed her with a single shot at close range, and then fired three shots at J.K., who was curled up on the bed. The evidence Emery murdered these four victims is overwhelming, and the evidence he deliberated prior to each of those murders was – if anything – even more so. The state engaged in no improper pleas to the jury's passion or unfair prejudice as already explained as part of his preserved and unpreserved claims on appeal, or in the isolated and harmless incidents Emery raises here for the first time.

Second, the evidence also overwhelmingly supported the aggravating circumstance that each of these murders was outrageously and wantonly vile, horrible, and inhuman, and that Emery displayed a depravity of mind in that he killed each of his four victims as part of a plan to kill all four of them. Before Emery killed K.K., he knew J.M. (down the hall) was calling the police. His decision to kill J.M. and the two children

40

(as the only remaining witnesses once K.K. died) was made before he shot K.K and a part of a plan to kill all four. The evidence showed that, after hearing K.K. tell J.M. to call the police, Emery got his pistol out of the gun safe, shot K.K. at close range, stepped over her body to go to the other bedroom where he executed her two small children and their immobilized grandmother. There is no question this statutory aggravating circumstance was supported by sufficient evidence, and Emery does not argue otherwise.

Finally, the death sentences in this case are not disproportionate to the penalty imposed in similar cases. The death penalty has been given (and upheld) frequently when the defendant murdered multiple victims. *See, e.g., Deck,* 303 S.W.3d at 552; *State v. Ringo*, 30 S.W.3d 811, 827 (Mo. banc 2000); *State v. Middleton*, 998 S.W.2d 520, 531 (Mo. banc 1999); *State v. Johnson*, 968 S.W.2d 123, 135 (Mo. banc 1998); *State v. Clemons*, 946 S.W.2d 206, 233 (Mo. banc 1997); *State v. Mease*, 842 S.W.2d 98, 115 (Mo. banc 1992); *State v. Powell*, 798 S.W.2d 709, 716 (Mo. banc 1990); *State v. Reese*, 795 S.W.2d 69, 75-76 (Mo. banc 1990); *State v. Sloan*, 756 S.W.2d 503, 511-12 (Mo. banc 1988); *see also State v. Hutchison*, 957 S.W.2d 757, 767 (Mo. banc 1997) (collecting cases where "the murder was part of a plan to kill more than one person or where more than one person was actually murdered").

Moreover, "[t]his Court has affirmed death sentences resulting from the murder of vulnerable, defenseless victims." *Wood*, 580 S.W.3d at 590. K.K. was helpless by the time Emery fired the fatal shot, and all three of the victims in the second bedroom were vulnerable and defenseless. J.M. was immobile and recovering from hip surgery. Z.K. and J.K. were small children with little ability to comprehend what was happening and no

ability to stop it. This accounts for why "this Court has repeatedly affirmed death sentences in cases involving the heinous killing of a child." *Id.*

After considering the nature of Emery's offenses and the strength of the evidence against him, this Court holds Emery's four death sentences were not excessive or disproportionate to the penalty imposed in similar cases. Accordingly, all of the statutory requirements set out in section 565.035.3 have been met.

## CONCLUSION

For the reasons set forth above, the judgment of the circuit court is affirmed.

_____
Paul C. Wilson, Judge

All concur.